UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

SANDRA KUBA,

        Plaintiff,                  Case No.: 6:21-cv-312-JA-LRH

v.

DISNEY FINANCIAL
SERVICES, LLC,

        Defendant.

_____/

## PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO COUNT I OF THE COMPLAINT, SUMMARY JUDGMENT DISMISSING DEFENDANT'S AFFIRMATIVE DEFENSES RELATED TO THE SAME AND INCORPORATED MEMORANDUM OF LAW

Plaintiff, Sandra Kuba ("Plaintiff" or "Kuba"), by and through her undersigned counsel, and pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 56, moves this Court for an Order: (i) granting Plaintiff's Motion for Partial Summary Judgment as to the liability of Defendant, Disney Financial Services, LLC ("DFS"), on Count I of her Complaint brought under the Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1514A ("SOX"); (ii) granting Plaintiff's Motion for Summary Judgment dismissing Defendant's First, Second, Third, Twelfth, and Thirteenth Affirmative Defenses; and (iii) awarding Plaintiff such other and further relief as the Court deems just and proper.

## I.    STATEMENT OF UNDISPUTED MATERIAL FACTS

The Walt Disney Company, together with its subsidiaries (collectively

"Disney"), is a diversified worldwide entertainment company.[1] In March 1999, Kuba began working for Disney as a Financial Analyst in Lake Buena Vista, Florida.[2] Doc. 1 ¶ 7; Doc. 34 ¶ 7. From late 2004 until October 4, 2012, Kuba also served as Code Administrator ("Code Admin") and chair of the Task Force for Package, Code and System Setup ("Task Force").[3] **Pl. Ex. 1** at DEF002121; Pl. Ex. 31 ¶ 8-11. In October 2013, Disney promoted Kuba to Senior Financial Analyst, the position she held until her termination on September 21, 2017. Doc. 1 ¶¶ 8, 35; Doc. 34 ¶¶ 8, 35.

On October 4, 2012, Finance Manager Glen O'Grady ("O'Grady") eliminated the Task Force and Code Admin role. Pl. Ex. 26 ¶¶ 11; Kuba Dep. 197:22-198:3. Afterwards, there were no written procedures or guidelines for how things worked for new packages, codes and system setups. Pl. Ex. 26 ¶¶ 11, 13; Kuba Dep. 198:8-15. Kuba continued to have a deep understanding of Code Administration and Disney's financial systems and reporting. Pl. Ex. 1 at DEF002121. Erroneous system setups

---

[1] Compl. ("Doc. 1") ¶ 11; Answer ("Doc. 34") ¶ 11. The Walt Disney Company is a publicly traded company with a class of securities registered under Section 12 of the Securities and Exchange Act of 1934 and is required to file reports under Section 15(d) of the Act. Doc. 1 ¶¶ 11, 41; Doc. 34 ¶¶ 11, 41.
[2] Prior to being employed by DFS in 2015, Kuba was employed by other legal entities while working for Disney as a Financial Analyst and later as a Senior Financial Analyst. **Plaintiff's Exhibit** ("Pl. Ex.") **31**, **Declaration of Sandra Kuba** ("Pl. Ex. 31") ¶¶ 5-15. It is undisputed that Kuba worked for DFS as a Senior Financial Analyst in the Revenue Operations Department ("Rev Ops"), which is involved with Disney's internal accounting and reporting systems. Doc. 1 ¶ 9; Doc. 34 ¶ 9.
[3] In 2003, Disney implemented a Systems, Applications and Products system ("SAP"), which serves as Disney's General Ledger. Pl. Ex. 31 ¶ 6; **Deposition of Sandra Kuba** 359:1-360:10; **Deposition of Doris LeStourgeon Vol I ("DL Dep. I")** 22:16-23:12. The installation went poorly and there were numerous problems with SAP communicating with various Disney systems. Pl. Ex. 31 ¶ 6; DL Dep. I 35:24-36:22. As a result, Disney created the Code Admin role and Task Force (collectively "Code Admin Group") to ensure that (a) the appropriate approvals were received prior to creating a new charge code for a product, service, or package and (b) the accounting setup was mapped to ensure revenue was recognized pursuant to Generally Accepted Accounting Principles ("GAAP"). Pl. Ex. 31 ¶¶ 8-9; DL Dep. I 48:7-23.

were not being reviewed and fixed on a regular basis. Pl. Ex. 26 ¶ 17; Kuba Dep. 357:10-14; DL Dep. I 44:10-48:6; DL Dep. Ex. 2. DFS used manual journal entries to force balance accounts. Pl. Ex. 26 ¶ 22; Kuba Dep. 357:10-14; DL Dep. I 35:5-37:1. During 2016, DFS created IT tools to automatically force balance variances before transactions were recorded into SAP. Pl. Ex. 26 ¶ 2; Pl. Ex. 25 at Kuba000145. During her employment with DFS, Kuba, on a number of occasions, reported concerns to DFS Management regarding Disney's accounting policies, practices, and procedures. Doc. 1 ¶ 22; Doc. 34 ¶ 22.

On September 29, 2016, Kuba reported her concerns regarding accounting setup and flow in detail via an email to the then-President of Walt Disney World Resort, George Kalogridis ("Kalogridis"). Pl. Ex. 2. The Corporate Management Audit Department ("M&A") began an investigation into "potential financial irregularities and accounting control issues" based upon Kuba's concerns.[4] **Deposition of Scott Leingang ("SL Dep.")** 15:2-21; 17:15-24. On November 16, 2016, M&A Director of Special Reviews, Scott Leingang ("Leingang"), Senior Forensic Analyst, Meghi Parikh, and Employee Relations ("ER") Senior Manager, Shana Bawek ("Bawek"), met with Kuba. SL Dep. 18:1-19-2, 24:8-24; Pl. Exs. 326, 26 ¶ 20. During this meeting, Kuba detailed fraud against shareholders by O'Grady who was holding back revenue credits on theme park ticket revenue and then using that revenue for other purposes.[5]

---

[4] DFS claims all M&A reviews or investigations are subject to attorney-client privilege. SL Dep. 19:20-20:4.

[5] Disney's 10Q for Fiscal Year 2017 claims, "We recognize revenues from advance theme park ticket sales when the tickets are used. Revenues from annual pass sales are recognized ratably over the period for which the pass is available for use." This is not accurate. Pl. Ex. 26 ¶ 6. Disney estimates theme

Pl. Ex. 26 ¶ 20; **DL Dep. Vol II** 108:1-112:15. Kuba attempted to discuss her concerns over lack of internal controls, recognition of fictitious revenue, and accounting flow, but Leingang focused on O'Grady. Pl. Ex. 26 ¶ 20. M&A continued its investigation into Kuba's concerns until around December 2017. SL Dep. 22:17-23:2. Kuba provided additional information to Leingang and Bawek over the next several months. Pl. Ex. 26 ¶ 21. Later, Bawek informed Kuba that accounting flow did not matter and then asked Kuba if she had ever considered working at a different company. *Id.*

In early 2017, the Advisory & Assurance Department ("A&A") acknowledged that there were not any strong internal controls from an accounting and system flow perspective over non-cash media.[6] Pl. Ex. 4 at DEF002385. Kuba had begun to develop a Code Administration Transit Tool ("CATT") to assist duties previously performed by the Task Force. Pl. Ex. 26 ¶¶ 37-38. The CATT contained a Bobbi form, which was designed to facilitate receiving approvals and ensure the accounting flow followed GAAP. *Id.*; Pl. Ex. 6. A&A told Kuba that the Bobbi form was too complicated and was more focused on approvals than setting up the accounting flow to comply with GAAP. Pl. Ex. 26 ¶ 48. A&A did not understand the Bobbi form and decided it may be better to start from scratch. *Id.* ¶ 49. On April 11, 2017, A&A shared

---

park ticket usage and makes a weekly manual journal entry based upon estimated revenue. O'Grady was taking a percentage of the estimate and holding it back to plug variances or holes in financial reporting, "discover" revenue during difficult quarters, or pay for pet projects. **DL Dep. Vol II** 108:1-112:15.

[6] *See* Pl.'s Ex. 5 at DEF002385 (A&A answering questions regarding non-cash coupon codes: "How to apply and set up the non-cash coupon code in US? There is no current documented process to apply for one."; "How to assess whether the non-cash coupon code were set up reasonable? We do not check the actual back end accounting. If it were a large dollar amount hitting the wrong account then Revenue Operations or the local Finance Cast Member should catch it for their area.").

a blank approval form with Kuba, but the form had nothing to do with accounting flow. Pl. Ex. 5. The email provided no instructions or guidance for why it was sent to Kuba. *Id.* Kuba reviewed the form and asked A&A for assistance in identifying what the current process was for approvals so that she may begin creating a new form. *Id.* A&A Finance Manager Danette Martin ("Martin") refused to provide Kuba with A&A's current approvals process. *Id.*

On June 2, 2017, Kuba reported concerns regarding the misconduct of a coworker, Channing Kalso ("Kalso") to ER via email. Pl. Ex. 8. In her email, Kuba informed ER that: (a) Kalso did not want to analyze the SOX report she agreed to create nor did she want to present her work; (b) Kalso screamed at Kuba in response to Kuba encouraging Kalso to give the presentation; (c) despite being responsible for performing analytics work, Kalso and Barbara Fordham ("Fordham") provided incomplete SOX reporting to Kuba minutes before the reports were due to Kuba's supervisor, Quandra Love ("Love"); (d) Kalso and Fordham did not notify Kuba the report was not something they could complete in advance of the deadline; (e) Kalso had a history of avoiding her assignments which caused Kuba to perform Kalso's duties; (f) Kalso made false accusations against Kuba on May 23, 2017 related to Kuba's subordinate Fordham; (g) Kalso modified her accusations against Kuba when she was caught in a lie at least twice; and (h) Kalso created a Sports meeting, did not invite Kuba, and then reported Kuba's absence to Love in an effort to get Kuba in trouble. *Id.*; Pl. Ex. 26 ¶¶ 22-36. On June 6, 2017, Kuba sent ER a follow-up email in which she provided a detailed timeline of Kalso's misconduct and repeated her request

for assistance because she was concerned about being set up by Kalso. Pl. Ex. 9; Pl. Ex. 26 ¶ 36.

On June 15, 2017, Kuba learned that A&A was creating its own CATT. Pl. Ex. 10; Pl. Ex. 26 ¶ 53. Kuba believed that A&A had created this tool without seeking input from Rev Ops and without having a sufficient understanding of how Disney's accounting system worked. *Id.* A&A had made mistakes acting as Code Admin in the past. Pl. Ex. 26 ¶ 39. Kuba sent Love an email seeking assistance and Love forwarded that email to Andrew Howlett ("Howlett"). Pl. Ex. 10. Howlett then forwarded the email to ER and wrote, in part, "[w]e will try to minimize [Kuba's] latest round of concerns for the time being." *Id.* The same day, Kuba also learned that A&A had provided at least one incorrect charge code (the 6109 charge code) to the Cast Activities team and may be actively distributing charge codes without the required technical accounting knowledge. Pl. Ex. 11, Ex. 12, Ex. 26 ¶ 54. Kuba explained to Cast Activities that the coupons would need to be reprinted with the correct coupon code range for this type of transaction. Pl. Ex. 11. A&A's Bradford Smith ("Smith") requested that an exception be made to allow Cast Activities to use the coupon with the incorrect charge code. *Id.* He did not direct his request to Kuba nor did Kuba work on the two accounts involved. *Id.*; Pl. Ex. 26 ¶ 54. At 12:15pm, A&A Manager Martin demanded that Kuba provide the coupon code ranges for the entire Parks & Resort Segment and not just the specific Animal Kingdom attraction at issue. Pl. Ex. 11. Kuba did not feel comfortable providing this Disney confidential information until she had

a chance to investigate why A&A was distributing a charge code under these circumstances. Pl. Ex. 31 ¶¶ 54-56.

Later the same day, Kuba contacted Leingang, ER Manager Marisa Dye ("Dye"), and Bawek regarding concerns she had with lack of internal controls and manipulation of Disney's financial systems. Pl. Ex. 12. In her email, Kuba specifically identified A&A's circumvention of internal controls, Disney moving unearned deposits directly into revenue, and a two-million-dollar variance in a breakage account. *Id.* Kuba also stated that she did not know how often A&A gives out codes. *Id.* Dye and Leingang both ignored Kuba. Pl. Ex. 26 ¶ 55. The next morning, Love, without investigating what happened, pressured Kuba into providing Martin with whatever she needed. Pl. Ex. 26 ¶¶ 57-58. Under pressure, Kuba informed Martin that the Magic Backstage Winners would exchange coupons so their names matched up. Pl. Ex. 11. Less than twenty minutes later, Martin responded as follows:

> The response below did not answer the questions we asked below.
> Below you indicated because a code starting with a 6 was used and that the coupon would need to be reprinted. Brad explained how that occurred and asked if an exception could be made.
> You response below stating that 'Laurie has her coupon and will exchange it with the other winner' does not clearly explain to me the resolution of this issue. Was a new coupon code needed? Did it require a reprint? In addition, so the issue with an incorrect coupon code range does not occur again I asked for you to supply us with the ranges. Can you please provide these at your earliest convenience?
> Thanks in advance for your help. We apologize for any inconvenience this issue caused and appreciate your partnering to supply us with the needed information to keep it from occurring again.

Pl. Ex. 11 at Kuba00357. Martin admitted that Kuba had already explained what needed to be done to reprint the coupon and identify the correct charge code. Pl. Ex.

7

11. Martin's email gave Kuba (and any person reading it) the impression that A&A was going to continue giving out coupon codes in the future. *Id.*; Pl. Ex. 26 ¶¶ 59-60. On June 18, 2017, Kuba sent a second email to Kalogridis (copying Leingang who was actively investigating lack of internal controls) in which she stated, "[Disney] has no internal controls over the accounting system/accounting flow and, therefore [is] not in compliance with SOX." Pl. Ex. 11. In her June 18, 2017 email, Kuba also asserted that "the lack of segregation of duties for A&A and the lack of due diligence" had her "concerned about ethics." Pl. Ex. 11. Kuba further asserted that "[t]he errors in company codes, profit centers, and code set ups are resulting in more and more BDC sessions (transactions that fail in SAP) to be cleared by Cast" and "Financial Statements will become unreliable and fraud will be easier to commit." *Id.* The email built upon her September 2016 email to Kalogridis in which she laid out the need for improved internal controls. *Id.*

Kuba's concerns regarding internal controls were sent back to Kuba's leaders. Pl. Ex. 13. Love claimed that both she and Howlett experienced a "sense of shock" when they learned Kuba emailed Kalogridis on June 18, 2017. Pl. Ex. 7 at DEF002302. Tracy Willis ("Willis"), who was the DFS final decision maker regarding Kuba's termination, stated that ER and HR will help with holding Kuba accountable. Pl. Ex. 14. On June 20, 2017, A&A revealed the following to Willis: (a) A&A routinely gave out discount codes and approved discounts (Pl. Ex. 15 at DEF002236); (b) A&A has nothing to do with accounting flow or system setup for packages, codes or systems (*id.* at 2240); (c) A&A failed to train employees on discount codes which resulted in

them providing a coupon code (*id*. at 2237); (d) A&A had known for months that the process for system set up and functions previously completed by the Task Force and Code Admin were potential weaknesses within Disney's accounting systems (*id*. at 2238); and (e) even after its review, A&A was not positive on what teams were responsible for mapping the accounting flow behind new packages, codes and system setups (*id*. at 2236).

On June 19, 2017, Dye and Zephier Mehravian ("Mehravian"), met with Kuba. **Deposition of Marisa Dye ("MD Dep.")** 63:3-22. During this meeting, Kuba and Dye discussed Kuba's concerns about "A&A and the Backstage Magic Coupon Code" and how Disney was "[l]acking in internal controls". Pl. Ex. 7 at DEF002293. Dye also reviewed parts of Kuba's concerns regarding Kalso's attempts to "set her up." *Id.* Mehravian noted that Kuba was sincere during discussion on June 19, 2017. Over the next ten business days, Dye met with Love, Martin and Kalso. *Id.* During Dye's meeting with Kalso, Kalso admitted that she had raised her voice to Kuba on May 23, 2017. *Id.* Kalogridis never communicated to Dye that he was upset and he likely has an open door policy. MD Dep. 20:17-21:2. In early July, 2017, Dye claims she initiated an ER initiated investigation regarding Kuba with questions including, "Did Kuba have a reasonable basis for raising **ethical concerns** about [A&A] to George Kalogridis, President Walt Disney World Resort, on Sunday, June 18, 2017?"[7] Pl. Ex.

---

[7] "Ethical" does not appear anywhere in the June 18, 2017 email. Pl. Ex. 11. The word "ethics" in the June 18, 2017 email refers to the "Code of Ethics" as defined by 15 USC § 7264 which requires Senior Financial Officers of the Walt Disney Company to maintain standards reasonably necessary to promote "(2) full, fair, accurate, timely and understandable disclosure in periodic reports required to be filed by the issuer." *Id*. Dye's notes reflect that Kuba communicated to her on June 19, 2017 that

9

16 at DEF002275 (emphasis added); *see also* MD Dep. 16:20–24. Dye also initiated an investigation into whether Kuba raised a bad faith claim to ER regarding Kalso and Martin. Pl. Ex. 16 at DEF002274. Dye also initiated this investigation into the Kalso complaint without following up on the majority of Kuba's concerns and failing to interview several witnesses of Kalso's bullying and abusive behavior.[8] Pl. Exs. 7 - 9, 16. Dye was not qualified to evaluate the basis for Kuba's concerns regarding non-compliance with SOX. MD Dep. 8:1–6, 22:3–7, 33:14–25.  Dye explains the scope of her investigation as being surface level and excluding how the A&A mistake was an example of Disney's systematic lack of internal controls over non-cash media. MD Dep. 73:7–18 (". . .the scope of my investigation was understanding the basis for her concerns. I wasn't -- it's not ER's role to look into concerns about ethical violations"). In response to being asked whether she had familiarity with what internal controls are in place to prevent fraud at Disney, Dye responded, "That was not the scope of my investigation. As I said, [ER] doesn't look into allegations of fraud. . ." MD Dep. 123:10–19.

Dye created and circulated two (2) Executive Summaries following ER's investigation, "Executive Summary - Investigation re: Concerns Raised by Sandy Kuba" and "Executive Summary - Employee Relations Initiated Investigation re:

---

executive officers are required to make statements regarding internal controls. Pl. Ex. 7 at 2297. Kuba does not make a specific allegation of intentional fraud or "unethical behavior" against A&A; instead, she states that Disney lacks internal controls necessary under Section 404 of SOX and senior executives cannot meet their duties to certify that disclosures in periodic reports are "full, fair, [and] accurate" pursuant to 15 USC § 7264. *Id.*
[8] *Compare* Pl. Exs. 7, 8, 9 *with* Pl. Ex. 16.

Sandy Kuba." *See* Pl. Ex. 16. In the first Executive Summary, Dye misstates Kuba's concerns listing her "Allegations" as follows:

- Kuba alleged that during a discussion with Channing Kalso at her desk on May 23, 2017, Kalso *started screaming at her.*
- Kuba alleged that Kalso *talks down to her very badly - to the point of abuse.*
- Kuba alleged that Danette Martin's emails to her on June 15 and June 16, 2017, where she asked Kuba for information about the code used in the prize package for a Magic Backstage drawing, were *an attempt to bully her and run rough shot over her.*

*Id*. at DEF002274 (emphasis in original). Notably, Dye excluded any reference to Kuba's complaints regarding Kalso's repeated lies and attempts to set up Kuba.[9] Pl. Exs. 8, 9, 16 at DEF002274. With respect to the first allegation, Dye failed to include that Kalso admitted to raising her voice.[10] Pl. Exs. 7, 16. Dye also claimed Kuba changed her story, which is without support.[11] Pl. Exs. 7, 16. As to the second allegation, Dye failed to interview any witnesses concerning Kalso's abusive behavior toward Plaintiff outside of the May 23, 2017 incident. Pl. Ex. 7 at 2295-95. Dye misstates the Martin allegation raised by Kuba because Kuba already provided the appropriate code range for the Magic Backstage Pass. *Id*. The June 15 and June 16, 2017 emails were strictly limited to (a) Martin's demand for the charge code ranges throughout Disney Parks & Resorts and (b) Martin's demand for Kuba to approve use of the incorrect 6109 charge code by Cast Activities in accounts beyond her authority. *Id*.

---

[9] *Compare* Pl. Exs. 8,9 *with* Pl. Ex. 16 at DEF002274.
[10] *Compare* Pl. Ex. 7 *with* Pl. Ex. 16.
[11] *Compare* Pl. Ex. 7 *with* Pl. Ex. 16.

In her ER Initiated Investigation Executive Summary, Dye concluded that "Kuba did not have a reasonable basis for raising **ethical concerns** about Advisory & Assurance to George Kalogridis." Pl. Ex. 16 at DEF002275 (emphasis added). Dye provided the context of the "ethical concerns" as follows: "[Martin] and her team are *giving [codes] to anyone who wants one*" and "[Disney] has no internal controls over the accounting system/accounting flow and, therefore [is] not in compliance with SOX." *Id*. (emphasis in original). Kuba also alleged "the lack of segregation of duties for A&A and the lack of diligence has [Kuba] concerned about ethics." *Id*. Dye found "Kuba's allegations that Kalso screamed at her were not made in good faith" and "Kuba's allegation that Martin bullied her were not made in good faith." *Id*.

In this Executive Summary, Dye also omitted material information including, but not limited to, the following: (a) Kuba never alleged that A&A engaged in "unethical" conduct (Pl. Ex. 11); (b) Dye did not investigate any of the "ethical concerns" themselves (MD Dep. 73:7-18); (c) Kuba reached out to Dye, Leingang and Bawek prior to reaching out to Kalogridis on June 18, 2017 and was ignored (Pl. Ex. 12; Pl. Ex. 26 ¶ 55); (d) Dye lacks a basic understanding of Disney's accounting and financial systems and was not qualified to investigate the June 18, 2017 email (MD Dep. 8:1-5, 22:3-7, 33:13-25; 123:10-19); (e) Dye excluded an evaluation of whether there were internal controls from her investigation (MD Dep. 123:10-19); (f) Kalso admitted to raising her voice at Kuba (*id*. 101:2-10); (g) Martin has nothing to do with accounting and did not need the charge codes for business purposes (**Deposition of Danette Martin ("DM Dep.")** 25:8-13; 24:23-25:3); (h) Disney's policies prohibit

Kuba from providing Martin with the information or in the alternative justified Kuba withholding the ranges until she better understood Martin's need for said information (Pl. Ex. 17); (i) Kuba had already explained to Cast Activities what they needed to fix the Magic Backstage coupon and Martin had access to this communication (Pl. Ex. 11); (j) A&A failed to train employees on discount codes which resulted in them providing a coupon charge code (Pl. Ex. 15); (k) A&A had known for months that the process for system set up and functions previously completed by the Task Force and Code Administration were potential weaknesses within Disney's accounting systems (*id.*); (l) even after its review, A&A was not sure which, if any, teams were responsible for setting up new packages, codes and systems (*id.*); (m) Love was not sure what Revenue Operations' duties were in relation to setting up new packages, codes and systems (Pl. Ex. 7); and (n) Love and Kuba did not know A&A was giving out discount codes on June 18, 2017 (Pl. Ex. 7; Pl. Ex. 26 ¶ 59).

Further, Dye made several false statements. Dye claimed Kuba did not articulate a basis for her concern about "fraud" or "ethical concerns" (Pl. Ex. 16), but Kuba clearly stated her concerns were caused by a lack of "internal controls" and that "segregation of duties" and "due diligence" was the basis for her concerns (Pl. Ex. 11). Kuba also clarified that "[t]he errors in company codes, profit centers, and code set ups are resulting in more and more BDC sessions (transactions that fail in SAP) to be cleared by Cast" and "Financial Statements will become unreliable and fraud will be easier to commit." *Id.* Each basis was conveniently not within the scope of Dye's investigation. Pl. Ex. 16. Dye also claimed that Kuba bypassed other opportunities to

address her concerns when she emailed Kalogridis on June 18, 2017. *Id.* This is false because Kuba went to Dye, Leingang and Bawek on June 15, 2017. Pl. Ex. 12. Referring to earlier in the year, Dye falsely claimed "Kuba was uncooperative and unresponsive to requests for information." Pl. Ex. 16. Kuba worked diligently to provide all the information requested by A&A. Pl. Ex. 26 ¶¶ 37-51. In fact, A&A were the ones unwilling to partner with Kuba. Pl. Ex. 26 ¶¶ 41-51; Pl. Exs. 5, 6. Dye further claimed that Love confirmed Kuba had not been a good partner. Pl. Ex. 16. During her deposition, however, Love denied claiming that Kuba was a bad partner. **Deposition of Quandra Love ("QL Dep.")** 18:19-19:15.

Despite claiming she did not evaluate internal controls, Dye referenced them several times in her findings. Pl. Ex. 16 at DEF002275. Dye called Kuba "self-important and myopic" and elaborated "Kuba refused to accept reassurance from her leader [Love] that there are other internal controls in place." *Id.* Love admitted to Dye that she did not understand the processes in place for package, code and system setups.[12] Pl. Ex. 7 at 2301-2. Love also claimed proof of lack of internal controls needs to come from someone in higher leadership like Kalogridis. *Id.* There is a significant problem with Love's statements regarding the Cash Over/Short Account.[13] *Id.*; Pl. Ex.

---

[12] Dye's notes reflect that "Code Administration- processes in place. Discussion I had with her – understand what [Kuba] does v. A&A. Trying to get this out of her since I came in 10 months ago. Trying to understand the today. Discussion today. I see this and that. What I'm seeing from a high level standpoint, its in line. .01 percent – [cash] overs and shorts. People have not come down from a higher level. [Kuba is] in the weeds. I continue to hear – I see this and that. Bu[t] you haven't shown me anything." Pl. Ex. 7 at 2301-2.

[13] Coupons and charge codes replace the acceptance of cash at the point of sale. Pl. Ex. 26 ¶ 66. The only way a coupon transaction hits cash over/short is if Disney intentionally maps the charge code to

26 ¶ 66-67. Further, Cash Over/Short Account is being manipulated by Sales auditors to remove credits to the account. *Id.* ¶¶ 68-69; DL Dep.  80:18-81:9, 82:16-83:6; DL Dep. Ex. 8.

Dye shared her findings with Willis and recommended that Kuba be terminated. MD Dep. 26:11-18, 152:14-153:10. Relying upon Dye's three findings, Willis accepted the recommendation. **Deposition of Tracy Willis ("TW Dep.")** 17:4-19:20; Pl. Ex. 16. Dye admits Kuba's June 18, 2017 email to Kalogridis contributed to her decision to recommend Kuba's termination. MD Dep. 26:6-10. On or about August 17, 2017, Kuba filed a formal written TCR with the SEC. Pl. Exs. 26 ¶61. On September 21, 2017, Kuba was terminated. *Id.* ¶ 35. Kuba filed a complaint with OSHA within ninety (90) days of her termination. Pl. Exs. 18, 19, 20, 21. The Secretary of Labor did not issue a final decision within 180 days of Kuba's filing with OSHA. Pl. Ex. 20.

## II.   MEMORANDUM OF LAW

### A.   LEGAL STANDARDS

#### 1.   Legal Standard Summary Judgment

Under Fed. R. Civ. P. 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Factual issues are "genuine" when there is a real basis in the record. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*

---

hit cash over/short, the employee at the POS enters a code that does not exist, or if an employee manually journals into the cash over/short account. *Id.* ¶ 67.

475 U.S. 574, 586 (1986). The burden is on the moving party, and is satisfied if there is no evidence in the record to support an essential element of the non-moving party's case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). When deciding whether summary judgment is appropriate, "all evidence and reasonable factual inferences drawn therefrom" are reviewed in a light most favorable to the non-moving party. *White v. Mercury Marine*, 129 F.3d 1428, 1430 (11th Cir. 1997)(*quoting Warren v. Crawfo*rd, 927 F.2d 559, 561-562 (11th Cir. 1991). Additionally, all reasonable inferences will be drawn in favor of the non-moving party; however, the inferences must be plausible. *See Griesel v. Hamlin*, 963 F.2d 338, 341 (11th Cir. 1992); *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 743 (11th Cir. 1996).

### 2.      Defendant's Affirmative Defenses

Federal Rules of Civil Procedure 8(a) requires that an affirmative defense must contain, at a minimum, enough facts to put the Plaintiff on notice of the defense. Further, "[a] **defense** which points out a defect in the plaintiff's prima facie case is not an **affirmative defense**." *In re Rawson Food Serv., Inc.*, 846 F.2d 1343, 1349 (11th Cir. 1988)(emphasis added). District courts in the Eleventh Circuit have held that when a party incorrectly labels a negative averment as an affirmative defense rather than as a specific denial, the proper remedy is not to strike the claim, but rather to treat it as a specific denial. *See, e.g., Burns v. City of Cape Coral*, No. 2:10-cv-573-FtM-29DNF, 2011 U.S. Dist. LEXIS 60591, at *3 (M.D. Fla. June 7, 2011).

### B.      LEGAL ARGUMENT

### 1.      This Court Has Jurisdiction.

For purposes of this litigation, DFS does not contest it is a "covered" person under 18 U.S.C. § 1514A(a). *See* Stipulation ¶ 1.

### 2. **Plaintiff Has Satisfied her Administrative Remedies.**

To recover under § 1514A, an aggrieved employee must exhaust administrative remedies by "filing a complaint with the Secretary of Labor." *Dig. Realty Tr., Inc. v. Somers*, 138 S. Ct. 767, 773 (2018) (*quoting* 18 U.S.C. § 1514A(b)(1)(A)). And "if the Secretary has not issued a final decision within 180 days of the filing of the complaint and there is no showing that such delay is due to the bad faith of the claimant," the claimant may "bring[] an action at law or equity for de novo review in the appropriate district court of the United States." 18 U.S.C. § 1514A(b)(1)(B); *accord* 29 C.F.R. § 1980.114(a) (regulation titled "District court jurisdiction over retaliation complaints"). Here, Kuba filed an OSHA complaint against DFS on October 25, 2017 and the Secretary of Labor did not issue a final decision within 180 days of the filing of her OSHA complaint. Pl. Exs. 20. Kuba exhausted her administrative remedies.

### 3. **Plaintiff Has Established a *Prima Facie* Case.**

To prevail on her SOX whistleblower claim, Kuba must prove by a preponderance of the evidence that: (1) she engaged in protected activity; (2) DFS knew or suspected that she engaged in the protected activity; (3) she suffered an adverse action; and (4) the protected activity was a contributing factor in the adverse action. *Johnson v. United States DOL*, 814 F. App'x 490, 494 (11th Cir. 2020). If Kuba establishes these four elements, DFS may avoid liability if it can prove "by clear and

convincing evidence" that it "would have taken the same unfavorable personnel action in the absence of that protected behavior." *Id.*

### a.    Plaintiff engaged in protected activity.

The SOX whistleblower provision protects employees who "provide information, cause information to be provided, or otherwise assist in an investigation regarding any conduct which the employee reasonably believes constitutes a violation of section 1341, 1343, 1344, or 1348 [of Title 18 of the United States Code], any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders." 18 U.S.C. § 1514A(a)(1).

Here, the Parties entered a Joint Stipulation, which provides, in relevant part, that DFS will not contest that Kuba's emails dated September 29, 2016 to Kalogridis and dated June 18, 2017 to Kalogridis and Leingang qualify as "protected activity" for purposes of her claims brought under SOX, 18 U.S.C. § 1514A (Count I). Stipulation ¶ 2. As DFS does not contest that most of the June 18, 2017 email to Kalogridis, an executive over parts of Disney's Parks & Resorts Segment, and Leingang, an investigator designated by Disney to investigate "financial irregularities and control issues," Kuba has established that she engaged in protected activity under SOX.

### b.    Defendant had knowledge of the protected activity.

DFS had knowledge of the content of Kuba's June 18, 2017 email to Kalogridis and Leingang because the first finding of the ER Initiated Executive Summary summarized this protected activity and was – at least in part - the basis of Disney's decision. Pl. Exs. 16, 22.

18

c.    **Plaintiff suffered an adverse action and Defendant cannot dispute Plaintiff's protected activity was a contributing factor to her adverse action.**

Employers may not "discharge, demote, suspend, threaten, harass, or in any other manner discriminate against an employee in the terms and conditions of employment because of any lawful act done by the employee" 18 U.S.C. § 1514A. On September 21, 2017, Kuba was discharged. Doc. 1 ¶ 26, Doc. 34 ¶ 35; Pl. Ex. 22. In its January 8, 2018 statement to OSHA, DFS claimed "Kuba displayed a pattern of workplace complaints against certain workers without a reasonable basis for doing so, in a manner that was inappropriate, disruptive, and in bad faith." *Id.* DFS identified three separate concerns or complaints. Pl. Ex. 22 at Kuba000550. The first concern Kuba is contended to have raised without a reasonable basis is "Kuba did not have a reasonable basis for raising 'ethical concerns' about a mistake made by another department. *Id.* This concern references Kuba's June 18, 2017 email to Kalogridis and Leingang. *Id.* As DFS has acknowledged that they do not contest that this is a protected activity, this establishes that Kuba's protected activity was a contributing factor to the decision to terminate Kuba.[14] *Id.*

4.    **Defendant Cannot Meet Its Burden of Proof.**

Once a plaintiff has made a *prima facie* showing of whistleblower retaliation under SOX, the burden shifts to the employer. *Shea v. Kohl's Dep't Stores, Inc.*, No. 7:16-

---

[14] Dye admits that Kuba's June 18, 2017 email to Kalogridis contributed to her decision to recommend Kuba's termination. MD Dep. 26:6-10. Willis relied upon Dye's findings including the one related to Kuba's protected activity on June 18, 2017 and accepted the recommendation. TW Dep. 17:1-19:20. Other than the first two sentences, DFS does not contest that Kuba's June 18, 2017 email to Leingang and Kalogridis was protected activity. Stipulation ¶ 2.

cv-01155-TMP, 2019 U.S. Dist. LEXIS 56105, at *17 (N.D. Ala. Apr. 2, 2019)(*citing Johnson v. Stein Mart*, Inc., 440 F. App'x 795, 801 (11th Cir. 2011). Unlike other burden-shifting frameworks, the burden on the employer under SOX is a true burden of proof, not mere articulation of a non-retaliatory reason for the personnel action taken. *Id.* (*quoting Welch v. Chao*, 536 F.3d 269, 275 (4th Cir. 2008); *citing* 18 U.S.C. § 1514A(b)). The employer must rebut the plaintiff's *prima facie* case "'by demonstrating by clear and convincing evidence that the employer would have taken the same personnel action in the absence of the protected activity.'" *Id.*

DFS must offer evidence sufficient for a jury to find that Kuba was acting in bad faith and her conduct was so egregious it justified immediate termination. ER's Mehravian noted that Kuba was "[s]incere" when she met with Kuba alongside Dye on June 19, 2017. MD Dep. 60:11-13; MD Dep. Ex. 6. When Dye was questioned on why she opened the bad faith investigation, Dye responded as follows, "[Kuba] didn't articulate a basis for her concerns about fraud or ethical violations in my conversations with her. Rather, her concern was that if [A&A] was giving codes to anyone who wants one, it -- that could result in something unethical. And she had acknowledged to me that in this case, [A&A] may not have understood the process." *Id.* 30:2-31:4.

Disney's non-retaliation policy within its Standards of Business Conduct specifically encourages reporting areas of potential misconduct: "**Regardless of whom you contact, you will be assured that your concerns will be addressed promptly and fairly**. The Company does not tolerate any form of retaliation (including separation, demotion, suspension or loss of benefits) against anyone who makes a good faith

report of **potential misconduct** or helps with an investigation." Pl. Ex. 23 at DEF000005 (emphasis added). Regardless, Kuba identified actual misconduct: "[Disney] has no internal controls over the accounting system/accounting flow and, therefore [is] not in compliance with SOX." Pl. Ex. 11. Dye cited the reasonable basis for the protected activity complaint or concern in her Executive Summary. *Id.* Under Disney's own policies (and SOX), Kuba should have been protected from termination.

DFS carefully worded its Stipulation to exclude two sentences from protected activity in the June 18, 2017 email: "This Manager in Advisory & Assurance and her team are not setting up codes. They are simply giving 4-digit numbers to anyone who wants one." Further, it claims that it may still argue that "Tracy Willis, Andrew Widger, and/or Marisa Dye honestly believed that Plaintiff did not have a good faith, reasonable basis for making those statements." The attempt by DFS to parse out the specific reference to A&A giving out codes fails as almost identical and related statements populate the other sections of the June 18, 2017 Kalogridis and Leingang communication it does not contest.[15] Pl. Ex. 11. DFS cannot cling to the "Honest Belief Rule" or mere articulation of a legitimate non-discriminatory basis for termination to meet its burden to produce clear and convincing evidence under SOX.

### a.    Kuba raised concerns regarding Kalso in good faith.

---

[15] "Now you have [A&A] and who knows who else giving out 4-digit numbers so that one number is being used for a variety of things – tickets, F&B, etc. There is no documentation on it but there are coupons floating around with these numbers on them or maybe they just enter them in the system without documentation in some instances." and "Now the Company has no internal controls over the accounting system/accounting flow and, therefore, are not in compliance with SOX. The lack of segregation of duties for A&A and the lack of due diligence has me concerned about ethics." Pl. Ex. 11

DFS has a prohibition against harassment. Pl. Ex. 17. It defines bullying as follows: "**physical conduct that could reasonably be considered threatening**, intimidating or humiliating; **or intentionally sabotaging or undermining another's work performance**." *Id*. at DEF000785 (emphasis added). Kuba provided ER with a detailed timeline and evidence of Kalso's bullying behavior. Pl. Exs. 7,8,9; Pl. Ex. 26 ¶¶ 28, 36. The Company handbook states, "the Company will not tolerate retaliation against an employee who has made a good-faith complaint. . ." Pl. Ex. 17 at DEF000785.

Dye limited her investigation to "Kuba alleged during a discussion with [Kalso] at her desk on May 23, 2017, Kalso *started screaming at her*" and "Kalso *talks down to her very badly – to the point of abuse*." Pl. Ex. 16. These are two cherry picked statements that miss the entire point of why Kuba was concerned about Kalso setting her up for termination. Pl. Ex. 26 ¶ 28. As established above, Dye never interviewed or met with the corroborating witnesses for incidents of Kalso's bullying outside of May 23, 2017. Instead of investigating Kalso's shifting story, Dye spent her time investigating Kuba. It is undisputed that Kalso raised her voice to Kuba on May 23, 2017. Dye confirmed that Kalso admitted to her that Kalso raised her voice but excluded this material admission from her Executive Summary.[16] Dye claims that Kuba changed her story,

---

[16] *See* MD Dep. 101:2-10 ("I recall that [Kalso] acknowledged that her voice may have been a bit raised"). Relevant here, Merriam-Webster Dictionary's definition of "scream" (where, as here, it used as an intransitive verb) includes, "to speak or write with intense or hysterical emotion"; "to protest, demand, or complain vehemently"; and "to laugh hysterically." "scream." *Merriam-Webster.com*, https://www.merriam-webster.com/dictionary/scream (last visited May 4, 2022).

but Dye's interview notes from when she spoke directly with Kuba do not reflect any such change. Pl. Ex. 7[17] On the contrary, Dye's notes reflect how Kuba described Kalso's screaming:

> She was very very loud. It was her tone. Argumentative. She came over already in a huff. Someone else in the vicinity noted her tone. He turned around and put on his earphones. Edwin Alicia. The thing that bothered me about it - typical for Channing to push work on me.

*Id*. at DEF002294. On July 10, 2017, Love confirmed that there was no admission by Kuba regarding screaming. Pl. Ex. 7 at DEF002303 ("[Kuba] didn't come out and say [Kalso] didn't scream at her."). This is semantics and does not evidence bad faith.

### b.   Kuba's June 18, 2017 email to ER was made in good faith and constitutes protected activity under SOX.

When Kuba forwarded her June 18, 2017 to Kalogridis and Leingang to ER, she explained her personnel concerns with Martin's conduct, ". . . Martin feels she can bully me and run rough shot over me with setting up codes. . . My leader has been bringing her into meetings about the new form and system I have been building for Code Admin. [] Martin and her Team could have easily contacted me, but instead decided to take it over." Pl. Ex. 24 at DEF002158. As noted above, DFS must meet its burden by citing to evidence it would have discharged Kuba "in the absence of the protected activity." *Johnson*, 814 F. App'x at 494. Because DFS acknowledges that a vast majority of this email is protected activity, it cannot cite to this complaint related

---

[17] According to Dye's notes, ER asked Kuba, "What did she scream at you?" and Kuba responded, "Typical Channing - like a temper tantrum. Was making it very clear that her problem with this was because she didn't want to have to go through [the reporting analysis] and understand it well enough to be able to speak [about] it." Pl. Ex. 7 at DEF002294.

to circumvention of internal controls under SOX Section 404 as cause for Kuba's termination. Regardless, Kuba was acting in good faith.

Disney has a Confidential Information Policy which prohibits sharing proprietary information with employees internally or externally. Pl. Ex. 17 at 787. Martin demanded Kuba (a) provide all code ranges across Disney's Parks & Resorts Segment unrelated to the Magic Backstage Pass and (b) approve the use of the 6109 charge code which would have resulted in recognition of fictitious revenue and circumvention of internal controls. Pl. Ex. 26 ¶ 54. There is no disputing that Kuba provided the appropriate charge code range relevant to the Magic Backstage pass and took steps to investigate how this erroneous setup took place. Pl. Ex. 11; Pl. Ex. 26 ¶ 52. Kuba wanted to better understand how this erroneous setup and circumvention of internal controls required by SOX took place before disclosing Disney confidential information. Pl. Ex. 26 ¶ 59.

Martin acknowledged to Dye that she did not require the code ranges. Pl. Ex. 7 at DEF2307 ("Don't get involved in the accounting"). The question of whether Martin needed the code ranges for business purposes was outside of the scope of Dye's investigation. MD Dep. 106:16-19. Asking nicely or professionally for Disney confidential information does not remove Kuba's restriction on whom she may share certain information with at Disney. *Id.* 105:10-3. Kuba did exactly what Disney policy requires when an employee is compelled to reveal Disney confidential information and he or she has reason to believe that person is likely to misuse that information or circumvent internal controls. Remember, this was a confidential email to ER.

24

    **5.**    <u>**Defendant's Affirmative Defenses**</u>

    DFS's First, Second, Third, Twelfth and Thirteenth Affirmative Defenses are merely negative averments and should be dismissed. DFS has not identified what, if any, factual allegations support its claims under its Eleventh Affirmative Defense and, as such, it should be dismissed.

**III.**    <u>**CONCLUSION**</u>

    In sum, Kuba is entitled to partial summary judgment as to liability on her SOX claim as she has established a *prima facie* case and DFS cannot, in opposition to her instant Motion, proffer evidence of bad faith behind Kuba's actions justifying her termination by clear and convincing evidence. For the foregoing reasons, Plaintiff respectfully requests that this Court issue an Order granting her Motion for Partial Summary Judgment as to Count I of her Complaint and her Motion for Summary Judgment dismissing Defendant's Affirmative Defenses as to same pursuant to Fed. R. Civ. P. 56.

Dated: May 6, 2022                Respectfully submitted,

                                       <u>/s/ Frank M. Malatesta</u>
                                       FRANK M. MALATESTA, ESQ.
                                       Florida Bar No. 00097080
                                       Malatesta Law Office
                                       871 Venetia Bay Blvd, Suite 235
                                       Venice, Florida 34285
                                       Tel:  (941) 256-3812
                                       Fax: (888) 501-3865
                                       frank@malatestalawoffice.com
                                       staff@malatestalawoffice.com
                                       *Counsel for Plaintiff*