# United States District Court
## Middle District of Florida
### Orlando Division

SANDRA KUBA,

       **Plaintiff,**

**v.**
                              **Case No. 6:21-cv-312-JA-LHP**

DISNEY FINANCIAL SERVICES,
LLC,

       **Defendant.**

---

## ORDER

"[N]o department appears perfectly wise to the intimacy of its workers."[1] In this case, the Court is asked to determine whether a worker who voiced that perception was unlawfully retaliated against by her employer—or whether that question must go to a jury.

Defendant Disney Financial Services (DFS), as the name suggests, provides financial services to Walt Disney Parks and Resorts, U.S., Inc., a subsidiary of the Walt Disney Company (Disney). (Bawek Decl., Doc. 38-3, ¶ 3). On September 21, 2017, DFS fired Plaintiff Sandra Kuba, an eighteen-year veteran of the company who last served as a Senior Financial Analyst in the Revenue Operations department. (Kuba Decl., Doc. 37-2, ¶¶ 4–5, 62). DFS

---

[1] Joseph Conrad, *The Secret Agent* 73 (Penguin Classics 2007) (1907).

claims that it fired Kuba—an employee with a long history of prickly interactions—for making a series of unfounded, bad-faith accusations against her coworkers in violation of company policy. Kuba claims that she was actually fired for blowing the whistle on the company's unwise and unlawful accounting practices, which she reported both internally and to the Securities and Exchange Commission (SEC) shortly before her termination.

After her initial complaint to the Occupational Safety and Health Administration (OSHA) bore no fruit, Kuba filed this lawsuit, alleging that DFS had retaliated against her reports of financial impropriety in violation of the Sarbanes–Oxley Act (Count I), the Dodd–Frank Act (Count II), the California False Claims Act (Count III), and the Florida Private Whistleblower Act (Count IV). Kuba also alleges that during her time at the company DFS paid her less than her similarly situated male colleagues in violation of the Equal Pay Act (Count V).

On May 6, 2022, Kuba filed a Motion for Partial Summary Judgment (Doc. 37), seeking summary judgment solely on Count I of her Complaint.[2] Shortly thereafter, DFS filed its own Motion for Summary Judgment (Doc. 38) seeking a resolution of all counts. The Court heard argument on these motions on

---

[2] Kuba's Motion also asks this Court to "dismiss[]" a number of DFS's affirmative defenses. (Doc. 37 at 25). As DFS correctly points out, Kuba's request is effectively an untimely motion to strike, *see* Fed. R. Civ. P 12(f)(2), and is **DENIED** on that basis.

August 9, 2022, and the issues are ripe for adjudication. For the reasons set forth below, Kuba's Motion is **DENIED** and DFS's Motion is **DENIED in part and GRANTED in part**.

## I.   BACKGROUND

### 1. <u>Kuba's History at DFS</u>

Kuba, a Certified Public Accountant with degrees in accounting and accounting-forensics, began working as a Financial Analyst at DFS's predecessor company in March 1999. (Kuba Decl. ¶ 4; Kuba Dep., Doc. 38-24, at 187).[3] Five years into her tenure, in September 2004, Kuba took on the role of "Code Administrator," the leader of a "task force" responsible for creating, mapping, and issuing accounting codes—known as "coupon codes" or "charge codes"—for transactions on Disney premises paid for with coupons or prepaid guest packages. (Kuba Decl. ¶¶ 8–10; *see also* LeStourgeon Dep., Doc. 41, at 24–25). Kuba claims that her position as Code Administrator was essential to maintaining internal controls over these noncash media. (Kuba Decl. ¶ 10). Nonetheless, the task force was eventually "shut down" on October 4, 2012, and responsibility for administering the codes was dispersed across various teams.

---

[3] Kuba was originally hired by Disney Worldwide Services, Inc. (Kuba Dep. at 189). DFS became her employer in 2015, after a series of corporate restructurings at Disney. (*Id.* at 189–90).

(*Id.* ¶ 11).[4] According to Kuba, this led to repeated problems because erroneously mapped coupon codes pointed to the wrong accounts and in some cases led to the double-counting of revenue—an issue requiring manual correction. (Kuba Decl. ¶ 16).

In 2013, shortly after losing her Code Administrator role, Kuba was promoted to Senior Financial Analyst and placed in charge of the Lodging Team, a group within Revenue Operations that audited and reconciled accounts throughout Disney's vast ecosystem of hotels and restaurants. (Kuba Dep. at 201–02). Because of her prior experience, many of Kuba's coworkers continued to rely on her to help set up and troubleshoot codes, (Kuba Dep. at 202–04; Kuba Decl. ¶¶ 39, 41–42), and she retained a reputation as an "expert on charge codes," (LeStourgeon Dep. at 53). Kuba frequently expressed frustration that she had lost her position as Code Administrator yet was still being asked to help with these issues on top of her new responsibilities with the Lodging Team. (*See* Doc. 38-7 at 3; Doc. 38-9 at 1–2; Doc. 38-10 at 1–2).

On September 29, 2016, following what she perceived to be a negative

---

[4] Disney appears to dispute Kuba's characterization of herself as the "Code Administrator" of a "task force" that was eventually "shut[] down" but agrees in substance that she was one of several employees responsible for issuing coupon and charge codes from 2004 until 2012, when she was "directed by her manager to share the code administration responsibilities with other teams in Revenue Operations." (Doc. 38 at 8 n.6).

annual performance review,[5] Kuba emailed her supervisors, Andrew Eun and Quandra Love, and accused them of blaming her for others' mistakes so that they could "get rid of the [Family and Medical Leave Act (FMLA)] girl" and force her into retirement. (Doc. 38-7 at 2). "What I get out of this evaluation is this: I'm leading the way in training and moving ahead in safety, but when it comes to skills I am at the bottom. Nothing I do adds value (Code Admin, Task Force, Mrs. Potts[6]) and I am worthless." (Doc. 38-7 at 2–3). Kuba stated that she would "not sign something where I have been blamed for things that I did not do nor will I keep silent against injustice" and claimed that while Eun and Love would "use this as another example of my negativism . . . I call it Freedom of Speech which is part of the First Amendment of the Bill of Rights of the U.S. Constitution ratified on December 15, 1791." (*Id.* at 2).

That same day, Kuba filed a complaint with Employee Relations and Human Resources, alleging, among other things, that (1) her salary was below that of her less-qualified male colleagues—despite her additional work on code

---

[5] During its annual performance reviews, DFS gives employees one of five possible ratings: "Leading The Way," "Moving Ahead," "Right On Track," "Falling Behind," or "Off Track." In 2016, Kuba received an overall rating of "Right On Track," which evidences "[s]olid [p]erformance," "[c]onsistently meet[ing] expectations and occasionally exceed[ing] some expectations," "[p]erforming at an effective and satisfactory level," and "[d]emonstrat[ing] required skills and abilities." (Doc. 38-4 at 11).

[6] "Mrs. POTTs," also known as the "Product Online Transmission Tool," was an accounting tool developed by Kuba and used by various departments within DFS. (Kuba Decl. ¶ 14).

administration, (2) she was being discriminated against for taking leave under the FMLA and for her "association with individuals with disabilities," and (3) she was being overworked with little help from her oft-absent subordinates. (Doc. 38-6 at 3–5). In her complaint, Kuba speculated that "it seems the plan has been to give me the lowest rating and raise possible each year and do nothing for me. Use my skills, use my education, but let me sit there and rot." (*Id.* at 5).

Later that night, Kuba sent another email—this time to George Kalogridis, then-President of the Walt Disney World Resort.[7] There, she recounted the dissolution of the Code Administrator role and expressed concern that she was being blamed when other departments failed to set up codes properly:

> The codes are a mess in all systems because the Code Admin was shut down in 2012 and anyone and everyone allowed [sic] to set them up. This is the company's foundation for the accounting flow. Now it is being looked at by three departments that have caused some of the issues and I am being blamed for things they are doing.

(Doc. 38-8 at 3). In addition, Kuba reported that the Advisory & Assurance department was "working with [Disney's Animal Kingdom] to set up a Guest Inconvenience coupon and code[8] for each attraction," warning that "[t]his will

---

[7] Kuba claims that she began drafting her email to Kalogradis a few days before she received her performance review. (Kuba Decl. ¶ 17; Doc. 48 at 3 n.4).

[8] One of Kuba's coworkers, Doris LeStourgeon, explained in her deposition that the "guest inconvenience" account was used to compensate guests for problems at

allow these codes to be used all over the property with no ability to control them," which would be "a fraud magnet and a fraudster's dream." (*Id.*). According to Kuba, she had previously "notified [Advisory & Assurance] of fraud and circumvention of internal controls" related to a similar account. (*Id.* at 2).

DFS initiated two separate investigations in response to Kuba's emails. The first, led by Shana Bawek of Employee Relations, looked into Kuba's personnel complaints, including the allegations about her performance rating, compensation, and FMLA issues. That investigation concluded in June 2017, finding no merit to Kuba's concerns. (Bawek Decl., Doc. 38-3, ¶¶ 8–10; Doc. 38-12). The second investigation, led by Management Audit, considered the allegations in Kuba's email to Kalogridis regarding coupon codes and accounting flow. While it is unclear from the record what came of this second investigation, Kuba claims that she met with a Management Audit employee, Meghi Parikh, who stated that she "did not see much fraud" and "acted as though she did not understand anything [Kuba] was saying with the codes." (Kuba Decl. ¶ 18). Kuba admits, however, that she "did not have much time to talk to [Parikh]" because Kuba was "getting ready to go on vacation." (*Id.*).

---

Disney's dining locations, among other things. (LeStourgeon Dep., Doc. 41, at 68–69). Like Kuba, LeStourgeon expressed confusion about why guest inconvenience codes were being set up for individual attractions and explained that long wait times, out-of-service rides, and other issues with the attractions were typically compensated through a different "global" account. (*Id.* at 75).

On November 4, 2016, about a week after their initial meeting, Kuba emailed Parikh with a new allegation. (*Id.* ¶ 19).[9] This time, she suggested that Glen O'Grady, a Revenue Operations manager, was "using the codes" to "manipulat[e] data" and "hold back credits into his balance sheet accounts in case something in his accounts went awry and he needed to clear it." (*Id.*). A few weeks later, Kuba spoke with Bawek, Parikh, and Scott Leingang, one of the Directors in Management Audit. (*Id.* ¶ 20). Although she "tried to speak to them about the lack of internal controls" and other accounting issues related to the codes, Kuba claims that Leingang was only interested in her specific accusations against O'Grady. (*Id.*). According to Kuba, Leingang told her that the amount of money involved was "not so large to be considered material in relation to Disney's revenue" but that he was concerned with the "lack of integrity" implicated by O'Grady's alleged conduct. (*Id.*). While it is unclear what became of Kuba's allegations against O'Grady, Kuba claims that Bawek later told her that "accounting flow was not important" and "asked if [Kuba] had ever

---

[9] That same day, Kuba again emailed Bawek, stating: "I am now doing the other teams' work (you know, the ones that are all better than me and get higher ratings)" and alleging that this additional workload was interfering with her FMLA leave. (Doc. 38-9 at 1–2). In a follow-up email that day, she wrote: "I will get no credit as usual and in reality I am doing most, if not all, of the work. This is why I have a low rating and never moved up the ladder." (*Id.* at 1). Kuba also expressed suspicion that she was "being set up (again)" and given so much work that she would start to "get things wrong so they can 'get me on my work' (George Gross' method of going after people on FMLA)." (*Id.* at 2).

considered working at a different company." (*Id.* ¶ 21).[10]

Throughout the next seven months, Kuba continued to express frustration with her treatment at work, the problems caused by the dissolution of the Code Administrator role, and the perceived incompetence of her coworkers. On January 25, 2017, for example, Kuba emailed Bawek about a series of codes that had been set up improperly by another team. "As the Code Administrator, I had the ability to stop some of this," she wrote, "but in my current role I have no power over it and those setting them up feel they do not need to pay any attention to me." (Doc. 38-10 at 1). Kuba then complained about spending "60 [hours] a week" on code administration issues on top of her formal duties for the Lodging Team and relayed a theory from an unnamed coworker that "from the look of it, I am being set up for failure . . . they are trying to get me to quit." (*Id.* at 1–2). The next week, Kuba forwarded an email chain to Bawek in which a coworker from Advisory & Assurance asked about her process for setting up codes during her time as the Code Administrator. (Doc. 38-10 at 5). Kuba asked Bawek: "If this model of the Code Admin was so successful . . . then why was it shut down?" (*Id.*). She then theorized that "[t]hey either want to know what I did because they want to take the credit for it or because I am being forced into

---

[10] DFS denies that Bawek told Kuba that accounting flow did not matter and explains that Bawek's "only question to Kuba about alternate employment was to determine Kuba's level of satisfaction with her existing role." (Doc. 47 at 4 n.5).

early retirement and they need to get every bit of knowledge I had before I'm gone." (*Id.*).

A few months later, Kuba sent a lengthy email to Love, her direct supervisor, with the subject line "Meet the real Sandy Kuba." (Doc. 38-11). In it, Kuba reiterated her belief that she was overworked and underappreciated, referring to herself as the "FMLA Asperger girl," and writing: "If [another team] does something wrong, I get blamed for it. If I do something good, someone else gets credit. I am certain that no matter what I do, it is not any good yet more people have stolen my ideas or tried to." (*Id.* at 2). Despite this, Kuba insisted, "I still come in, do my work, and never get credit all while being treated like less than a human being." (*Id.* at 3).

### 2. The Kalso "Screaming" Incident

On May 24, 2017, Kuba sent another email to Love claiming that she was forced to "FMLA [herself] out of the office," after a coworker, Channing Kalso, "scream[ed]" at her and accused her of not inviting another coworker, Barbara Fordham, to important work meetings. (Doc. 38-21 at 1). According to Love, she immediately met with Kuba to discuss the issue and followed up during their weekly one-on-one meeting. (Love Decl., Doc. 38-20, ¶ 4). At that meeting, Love says, Kuba "acknowledged that Ms. Kalso had not really 'screamed,' but had used a 'tone,'" and Love left the meeting feeling that the issue had been resolved.

10

(*Id.*).[11]

A week later, however, on June 2, 2017, Kuba filed a formal complaint with Employee Relations, again alleging that Kalso "scream[ed]" at her and frequently "talk[ed] down to [her] very badly—to the point of abuse." (Doc. 38-33, at 1). Kuba also alleged that Kalso refused to cover Fordham's work while she was on vacation and that "[i]nstead I ended up doing it (AS USUAL). No wonder people call me Cinderella in the building." (*Id.* at 2). Kuba then complained: "I am dealing with incompetents and laziness—people who do not know how to do their jobs despite repeated training and those who sit and gossip and cause issues all day long." (*Id.*).

The next week, Kuba sent a follow-up email in which she again stated that Kalso and Fordham were "not competent in their jobs or simply too lazy to do them" and lamented that "the two non-workers and trouble-makers are trying to set up the good worker [Kuba] and the only one in the [department] who can do a lot of the work." (Doc. 38-17 at 1). Then, in a statement apparently directed at Employee Relations, Kuba wrote, "[S]omehow I am sure this is all my fault. That is how you twist it," before warning that she was "not going to sit back and let you all set me up–again." (*Id.*).

---

[11] Kuba confirms that she discussed the incident with Love during their weekly one-on-one meeting but denies telling Love that Kalso did not actually scream at her. (Kuba Dep. at 241–42).

Kuba's allegations against Kalso sparked another Employee Relations investigation—this time led by Marisa Dye, who scheduled a meeting with Kuba on June 19, 2017. (Kuba Dep. at 121, 244–45). Before that meeting took place, however, another problem emerged.

### 3. The "Magic Backstage" Incident

On June 8, the Cast Activities, Recognition, & Experience team notified Kuba that one of her subordinates had won a "Magic Backstage" employee drawing and asked Kuba to help deliver the prize package, which included free tickets to a Disney park and lunch coupons for a Disney restaurant. (Doc. 38-35 at 10–11). Kuba delivered the prize package to the winner but discovered that the codes listed on the lunch coupons were incorrect. She emailed Cast Activities to tell them that the coupons would "need to be reprinted" with the correct codes and asked who was responsible for the mix-up. (*Id.* at 6). Cast Activities responded that they had received the coupon code from Brad Smith and Danette Martin in Advisory & Assurance and had cleared them with the legal team. (*Id.* at 5). Eventually, Smith himself joined the email exchange and explained that he had been out of town and someone from his team had pulled the coupon code in his absence. He then asked Kuba if it would be "appropriate to make an exception for this instance so we can get the coupon out (especially since it's just a one time code)." (*Id.* at 4–5). Martin also joined the exchange and asked: "If

12

there are ranges for different coupon types, can you please provide them?" (*Id.* at 4).[12]

Instead of responding to Smith or Martin, Kuba forwarded the email exchange to Employee Relations and Management Audit on Thursday, June 15, claiming that the Advisory & Assurance team had "played Code Administrator" and "[come] up with a code off the cuff" to give to Cast Activities. (Doc. 38-34 at 1). Although admitting that she did not "know how often [Advisory & Assurance] did this," Kuba warned that using the wrong codes would lead to accounting errors and could require manual corrections. (*Id.*).

Three days later, on Sunday, June 18, Kuba forwarded the "Magic Backstage" email thread again—this time to Kalogridis, the same Disney executive to whom she had sent her complaint in 2016. Kuba began her email

---

[12] When Kuba did not respond to this request, Martin sent a second email stating:

> Below you indicated [that] because a code starting with [the wrong number] was used . . . the coupon would need to be reprinted. Brad explained how that occurred and asked if an exception could be made. . . . Was a new coupon code needed? Did it require a reprint?
>
> In addition, so the issue with an incorrect coupon code range does not occur again I asked for you to supply us with the ranges. Can you please provide these at your earliest convenience?
>
> Thanks in advance for your help. We apologize for any inconvenience this issue caused and appreciate your partnering to supply us with the needed information to keep it from occurring again.

(Doc. 38-48 at 3).

bluntly, stating: "This Manager [Martin] in Advisory & Assurance and her team are not setting up codes. They are simply giving 4-digit numbers to anyone who wants one." (Doc. 38-35 at 1). She then explained that "despite [her] complaints and warnings . . . there has been a desire to push Code Admin out to everyone" and warned that, as a result, "the company has no internal controls over the accounting system/accounting flow and, therefore, [is] not in compliance with [the Sarbanes–Oxley Act]." (*Id.*). Because of this, Kuba wrote, "Financial Statements will become unreliable and fraud will be easier to commit." (*Id.*). She also stated that the "lack of segregation of duties for [Advisory & Assurance] and the lack of due diligence has me concerned about ethics," before concluding somewhat cynically that "[w]hoever wanted me and the Code Admin out of the way[] has gotten what they wanted." (*Id.*).

Twenty minutes later, Kuba forwarded her Kalogridis email to Dye and Bawek, writing: "I blame [Employee Relations] and [Human Resources] for a lot of this. You helped to hold me down with little to no raises, promotions, and bogus 90-day plans so that I am too low in the organization to fight any of this." (Doc. 38-18 at 1). According to Kuba, this was "one reason why Danette Martin feels she can bully me and run rough shot [sic] over me with setting up codes. She knew full well who to contact for a code . . . but instead decided to take it over. In addition, [Advisory & Assurance] taking credit for my work in the past

has already been established." (*Id.*). Kuba then lamented that "Code Admin once had internal controls, but it does not any longer." (*Id.*).

### 4.  The Employee Relations Investigation

The next day, Monday, June 19, Kuba attended her scheduled meeting with Dye. (Dye Dep., Doc. 38-44, at 63). Notes from that meeting indicate that in addition to the Kalso "screaming" incident, the duo discussed the "Magic Backstage" email exchange, Kuba's allegations against Advisory & Assurance, and her concerns about a lack of internal controls over coupon codes. (Doc. 38-49 at 1–2; Doc. 38-50 at 1–5).[13] The next week, Kuba and Dye met again to discuss these issues, as well as Kuba's allegations that Martin had "bull[ied]" her to get access to the code ranges. (Doc. 38-49 at 3–5; Doc. 38-50 at 5–8). According to Dye, the substance of Kuba's accounting concerns was beyond the purview of her investigation, which was limited to "the concerns that [Kuba] raised about the behavior and conduct of others"—namely, Kalso and Martin. (Dye Dep. at 55). After interviewing Kuba and her colleagues, however, the focus of this investigation shifted to Kuba's own behavior, as Dye became concerned

---

[13] Kuba claims that Dye "threatened" her at the end of this meeting, telling her that "if [she] told anybody else about [accounting concerns], that they would consider it retaliation against the company." (Kuba Dep. at 289–90). Dye denies this and instead claims that she told Kuba that "she would not be . . . retaliated against for raising concerns in good faith" and that DFS "would expect . . . other participants in the investigation [to] not be retaliated against [by Kuba] for . . . raising any concerns themselves." (Dye Dep. at 70). Notes taken by another Employee Relations member at the meeting reflect that Dye told Kuba "no one will retaliate against you and we ask you not to retaliate against someone else." (Doc. 38-49 at 2).

that Kuba had made specific allegations against Kalso, Martin, and Advisory & Assurance in bad faith. (*Id.* at 16).

Dye explained the results of her investigation in a pair of executive summaries that she presented to Tracy Willis, then co-head of DFS's Controllership group, on July 14, 2017. (Doc. 38-45).[14] In the first summary, Dye concluded that Kuba's allegations against Kalso and Martin were false. Based on her interviews with Kuba, Kalso, and their coworkers, for example, Dye determined that Kalso had not "screamed" at Kuba but had rather used a "tone" that Kuba did not like. (Doc. 38-45 at 2). Dye also concluded that the evidence presented by Kuba did not support her allegation that Kalso "talk[ed] down to her very badly, to the point of abuse." (*Id.*). Finally, Dye determined that Martin's emails to Kuba following the Magic Backstage coupon incident were "polite, professional, and appropriate, not bullying"—though Dye did not address whether Martin had a valid reason for requesting the code ranges in the first place. (*Id.*).

In the second summary, Dye turned her attention to Kuba's own culpability. Having already found that Kalso did not "scream" at or act abusively

---

[14] The Controllership group was the entity within DFS that oversaw Revenue Operations, the department in which Kuba worked. Willis led that group until May 2017, when she moved to Burbank, California, to become the Senior Controller at DFS. She maintained joint responsibility for Revenue Operations with her successor, Andrew Widger, until Widger formally took the reins in mid-July 2017, shortly after the duo made the decision to fire Kuba. (Willis Decl., Doc. 38-1, ¶ 2; Willis Dep., Doc. 38-56, at 14–16).

toward Kuba and that Martin did not "bully" her by asking for coupon codes following the Magic Backstage incident, Dye determined that Kuba's allegations to the contrary were "not made in good faith," in contravention of company policy. (*Id.* at 3). To support this conclusion, Dye explained that Kuba had "revealed [a] personal bias" against Kalso during her interviews. (*Id.*). This was caused in part by Kuba's "frustration about occasions that she felt she had to cover for Kalso's absences," as well as a belief that Kalso had "set her up" by reporting Kuba's own absence from meetings to which she was never invited. (*Id.*). With respect to the allegations against Martin, Dye found that Kuba had used "provocative and inflammatory language to describe Martin's conduct" that was simply not warranted by the evidence. (*Id.*).

In addition to her conclusions regarding the allegations against Kalso and Martin, Dye also determined that "Kuba did not have a reasonable basis for raising ethical concerns about Advisory & Assurance" in her June 18 email to Kalogridis. (*Id.*). Dye pointed to three allegations made by Kuba in that email: first, that Martin and her team at Advisory & Assurance were "giving [codes] to anyone who wants one"; second, that "the company has no internal controls over the accounting system/account flow and, therefore, [is] not in compliance with SOX"; and third, that the "lack of segregation of duties for [Advisory & Assurance] and the lack of diligence has [her] concerned about ethics." (*Id.*).

Without passing on the validity of these statements, Dye found that "Kuba did not articulate a basis for her concern about fraud or ethical violations" and "bypassed other opportunities to address her concerns" before emailing Kalogridis. (*Id.*). Dye suggested, for example, that Kuba could have engaged directly with Advisory & Assurance, contacted her own supervisors, or raised the issue at her upcoming Employee Relations meeting. (*Id.*). Dye also noted that "Kuba was upset with [Advisory & Assurance] for personal reasons," believing that its members were stealing her ideas and taking credit for them. (*Id.*). Each of these factors contributed to Dye's determination that Kuba lacked a reasonable basis for her allegations against Advisory & Assurance. (Dye Dep. at 131). Based on her conclusions, Dye recommended that Kuba be fired. (*Id.* at 26).

### 5. **Kuba's Termination and its Aftermath**

Willis received Dye's executive summaries on July 14, 2017, and met with her later that day to discuss her findings. (Willis Decl., Doc. 38-1, ¶ 4). According to Willis, she left this meeting feeling that "Dye's investigation was thorough." (*Id.* ¶ 5). Willis stated that she "honestly believed that Kuba had not made the accusations against [Kalso, Martin, and Advisory & Assurance] in good faith." (*Id.*). In Willis's opinion, that constituted a violation of company policy that "warranted termination." (*Id.*). Willis then discussed Dye's findings with

Widger, Willis's incoming successor, and the two agreed that Kuba's employment would be terminated. (Widger Dep., Doc. 38-58, at 10–11).

The record suggests that Kuba was scheduled to be fired on July 28, 2017. (*See* Kuba Dep. at 311–13, 320–21). On July 27, however, Kuba left work and began a weeks-long medical leave of absence. (*Id.* at 321). In early August, while still on leave, Kuba contacted the Securities and Exchange Commission (SEC) to report her concerns regarding DFS's lack of internal controls, first by phone and then through the SEC's online Tips, Complaints, and Referrals (TCR) platform. (*Id.* at 336–38; Kuba Decl. ¶ 61). One month later, at the request of the SEC, Kuba supplemented her TCR with additional materials. (Kuba Dep. at 338–39).

Kuba returned to work on September 12, 2017. (*Id.* at 321). On September 21, during a face-to-face meeting, Widger fired Kuba. (*Id.*). According to Kuba, Widger and a Human Resources employee began the meeting by recounting her allegations against Kalso, Martin, and Advisory & Assurance and then communicated the company's position that these allegations had been made in bad faith. (*Id.* at 324–25). Kuba claims that before Widger officially fired her she held up the first page of her TCR and told him that she had filed it. (*Id.* at 329).

After Widger confirmed that she was being fired, Kuba says, she asked him if he "really want[ed] to do that," given her TCR, but Widger did not budge. (*Id.*).[15]

One month after her termination, on October 25, Kuba filed a whistleblower retaliation complaint with the Occupational Safety and Health Administration (OSHA). (Kuba Decl. ¶ 63). When the Secretary of Labor failed to issue a final decision within 180 days, Kuba dismissed her OSHA complaint and filed suit in this Court. (Kuba Dep. at 385). Both parties now move for summary judgment.

## II.   LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must construe the facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). "However, [courts] draw these inferences only 'to the extent supportable by the record.'" *Penley v. Eslinger*, 605 F.3d 843, 848 (11th Cir. 2010) (quoting *Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007)). "Thus, the requirement to view

---

[15] Kuba admitted in her deposition that, to her knowledge, this was the first time anyone at DFS knew that she had contacted a government agency. (Kuba Dep. at 326). Kuba speculates, however, that Willis and Widger suspected Kuba was talking to the SEC because of her repeated invocation of the Sarbanes–Oxley Act and Dye's alleged warning not to talk to anyone about her concerns. (*Id.* at 345–46).

the facts in the nonmoving party's favor extends to genuine disputes over material facts and not where all that exists is 'some metaphysical doubt as to material facts," *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). "Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Sawyer v. Southwest Airlines Co.*, 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)).

## III.   DISCUSSION

### A. <u>The Sarbanes–Oxley Whistleblower Claim (Count I)</u>

Congress enacted the Sarbanes–Oxley Act (SOX) in 2002 "[t]o safeguard investors in public companies and restore trust in the financial markets following the collapse of Enron Corporation." *Lawson v. FMR LLC*, 571 U.S. 429, 432 (2014). To that end, one provision of SOX makes it unlawful for a public company or certain subsidiaries of a public company to "discharge, demote, suspend, threaten, harass, or in any other manner discriminate against any employee" who "provide[s] information" to authorities either within or without the company "regarding any conduct which the employee reasonably believes constitutes a violation of section 1341, 1343, 1344, or 1348, any rule or

regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders." 18 U.S.C. § 1514A(a).[16]

To establish a prima facie case of retaliation under SOX, a plaintiff must show by a preponderance of the evidence that "(i) the employee engaged in a protected activity or conduct; (ii) the [employer] knew or suspected, actually or constructively, that the employee engaged in the protected activity; (iii) the employee suffered an unfavorable personnel action; and (iv) the circumstances were sufficient to raise the inference that the protected activity was a contributing factor in the unfavorable action." *Johnson v. Stein Mart, Inc.*, 440 F. App'x 795, 800 (11th Cir. 2011) (quoting 29 C.F.R. § 1980.104(b)(1)).

Unlike Kuba's other retaliation claims (discussed below), SOX does not follow the familiar burden-shifting framework outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973). Instead, once a plaintiff has established a prima facie case of retaliation under SOX, an employer may only escape liability by establishing "by clear and convincing evidence that [it] would have taken the same personnel action in the absence of the protected activity." *Stein Mart*, 440 F. App'x at 801 (quoting *Welch v. Chao*, 536 F.3d 269, 275 (4th Cir. 2008)). The practical effect of this difference is that "the defendant's burden under [§ 1514A(a)] is notably more than under other federal employee protection

---

[16] DFS stipulates that it is covered by § 1514A(a) for the purposes of this case. (Doc. 39 ¶ 1).

statutes, thereby making summary judgment against plaintiffs in Sarbanes–Oxley retaliation cases a more difficult proposition." *Leshinsky v. Telvent GIT, S.A.*, 942 F. Supp. 2d 432, 441 (S.D.N.Y. 2013).

### 1. The Prima Facie Case

An employee engages in protected activity under SOX when she provides information about conduct that she "reasonably believes" constitutes a violation under the Act to "a person with supervisory authority over the employee." § 1514A(a). To satisfy this requirement, the employee must "demonstrate both a subjective belief and an objectively reasonable belief that the company's conduct violated" the law in question. *Gale v. U.S. Dep't of Labor*, 384 F. App'x 926, 930 (11th Cir. 2010). Notably, however, the employee is not required to prove that a violation actually took place. *See, e.g., Collins v. Beazer Homes USA, Inc.*, 334 F. Supp. 2d 1365, 1376 (N.D. Ga. 2004).

Here, there is little doubt that the core of Kuba's June 18 email to Kalogridis—including her statement the company lacked "internal controls over the accounting system/accounting flow" for coupon codes and was thus "not in compliance with SOX"—constituted "protected activity" under § 1514A(a). In fact, DFS has stipulated to just that. (Doc. 39 ¶ 2). It is also clear that DFS knew about this protected activity and that Kuba "suffered an unfavorable personnel action" when she was fired from her job. The only question remaining at this

stage, then, is whether Kuba's protected activity was "a contributing factor" in her termination.

According to the Eleventh Circuit, "[a] 'close temporal proximity' between the protected expression and an adverse action is sufficient circumstantial evidence of a causal connection for purposes of a prima facie case." *Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004). As DFS correctly points out, "[t]he Supreme Court has established a demanding standard for reliance on temporal proximity alone . . . , requiring the events to be 'very close' in time." (Doc. 38 at 17 (quoting *Clark Cnty. School Dist. v. Breeden*, 532 U.S. 268, 273 (2001)). Indeed, the Supreme Court has "cited with approval decisions in which a three to four month disparity was found to be insufficient to show causal connection." *Higdon*, 393 F.3d at 1220 (citing *Breeden*, 532 U.S. at 273). At the same time, however, the Eleventh Circuit has "held that a period as much as one month between the protected expression and the adverse action is not too protracted." *Id.* (citing *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1457 (11th Cir. 1998)).

Kuba engaged in protected activity on June 18, 2017. Although she was not fired until September 21, DFS insists that the *decision* to fire her was made on July 14, less than one month after her email to Kalogridis. But the fact that DFS's plan to fire Kuba was delayed by her own decision to take medical leave before that plan was executed does little to undermine the inference of causation

justified by temporal proximity. Perhaps recognizing this, DFS challenges causation in a different way. Pointing to Kuba's first email to Kalogridis in 2016—which the parties stipulate was also protected activity, (Doc. 39 ¶ 2)—DFS argues that "no reasonable jury could conclude that Willis would not retaliate after Kuba's alleged whistleblowing activity in September 2016, but then suddenly decide to retaliate against her after" sending a similar email on June 18, 2017. (Doc. 38 at 17).[17]

The Court is not convinced. A reasonable jury might conclude, for example, that Kuba's second email to Kalogridis demonstrated a dogged commitment to the issue that DFS was unwilling to humor further. Alternatively, a jury might conclude that the direct allegation in Kuba's June 18 email—that DFS was "not in compliance with SOX"—provided a more urgent cause for retaliation. To be clear, the Court is not suggesting that either of these suppositions is correct. But their easy invention undermines DFS's suggestion that it would be wholly unreasonable to attribute an inference of causation to the temporal proximity between Kuba's June 18, 2017 email and DFS's decision

---

[17] DFS also argues that "Kuba's own actions sever any causal connection she may attempt to establish through an alleged temporal proximity." (Doc. 38 at 18 (citing *Hall v. Teva Pharm. USA, Inc.*, 214 F. Supp. 3d 1281, 1288–89 (S.D. Fla. 2016))). But the only action cited by DFS that occurred after Kuba's June 18 email to Kalogridis was the email she sent later that day to Employee Relations, in which she complained that Martin "feels she can bully me and run rough shot [sic] over me with setting up codes." As the Court discusses elsewhere in this Order, that email may itself constitute protected activity, a possibility fatal to DFS's severance argument.

to fire her less than a month later. The two emails to Kalogridis, though similar in kind, are different in degree, and a reasonable jury might fairly treat them as separate instances of protected activity.

And evidence of temporal proximity is not the only factor suggesting that Kuba's protected activity may have contributed to her termination. Willis and Widger, the two leaders who made the decision to fire Kuba, admitted that they based this decision on the "findings and recommendations" Dye presented in her executive summary. (Widger Dep. at 11; Willis Dep. at 15–16). Dye, in turn, admitted that her investigation into Kuba's behavior was spurred, at least in part, by Kuba's June 18 email to Kalogridis. (Dye Dep. at 90–91).

Although Dye claims that Kuba's concerns about a lack of internal controls and non-compliance with SOX were outside the scope of her investigation, (*id.* at 123, 139), she did discuss these issues with Kuba, (*id.* at 55), and quoted them directly in her executive summary, (Doc. 38-45 at 3). And while Willis and Widger both insist that Kuba's statements about "internal controls, SOX, segregation of duties, and ethics" in her June 18 email "were not a factor in [their] decision to terminate her employment," (Willis Decl. ¶ 8; *see also* Widger Decl. ¶ 6), the jury is free to weigh such testimony against other evidence, including the inclusion of those issues in Dye's executive summary and Kuba's testimony that Dye "threatened" her not to raise her concerns with anyone else, (Kuba Dep. at 289–90). Moreover, as the Court discusses below, a

jury might reasonably determine that that the *proffered* reason for Willis and Widger's termination decision—"Kuba's statement that the [Advisory & Assurance] team was giving out codes to anyone who wants one," (Willis Decl. ¶ 8; Widger Decl. ¶ 6)—was itself protected activity, negating any need for a causal inference.

The Court concludes that a reasonable jury could find that Kuba has established by a preponderance of the evidence that she engaged in protected activity, that DFS knew of her protected activity, that she suffered an unfavorable personnel action, and that circumstances exist which create an inference that the protected activity was a contributing factor in that unfavorable personnel action. In other words, the jury could find that Kuba has established her prima facie case of retaliation under SOX. Accordingly, DFS may only succeed at the summary judgment stage if there is no genuine dispute that the record clearly and convincingly shows that DFS would have taken the same unfavorable personnel action in the absence of Kuba's protected activity.

### 2. DFS's Rebuttal

To rebut Kuba's prima facie case, DFS argues that Willis and Widger would have fired Kuba regardless of her stipulated protected activity because they "honestly believed" following Dye's investigation "that Kuba had not made the accusations against [Kalso, Martin, and Advisory & Assurance] in good faith

as required by company policy, and . . . her actions warranted termination." (Willis Decl. ¶ 5; Widger Decl. ¶ 4).

As a threshold matter, the Court is skeptical that such a bare assertion of propriety, by itself, could possibly satisfy an employer's heightened burden under SOX to provide "clear and convincing evidence" in rebuttal of an employee's prima facie case. To support its argument to the contrary, DFS cites *Johnson v. Stein Mart, Inc.*, an unpublished case in which the Eleventh Circuit affirmed a grant of summary judgment to an employer that argued its employee "would have been terminated for performance reasons regardless of her protected activity." (Doc. 38 at 18 (citing 440 F. App'x 795 (11th Cir. 2011))). In *Johnson*, however, the court emphasized that the employer's "non-retaliatory rationale" was well-documented and "amply corroborated." 440 F. App'x at 801. For example, the court highlighted the employee's "*abundantly demonstrated* failure to substantially improve . . . during her probationary period despite receiving multiple prior warnings . . . [and] several meetings with her supervisor specifically designed to assist her in handling the position in a more satisfactory manner." *Id.* at 802–03 (emphasis added). Prior to her termination, in fact, the employee in *Johnson* "received a 'Final Warning' which notified her that her performance must improve significantly within 90 days, or she would risk further disciplinary action." *Johnson v. Stein Mart, Inc.*, No. 3:06-cv-341-J-33TEM, 2007 WL 1796265, at *3 (M.D. Fla. June 20, 2007).

28

Here, DFS has offered no comparable documentation or corroboration to show by clear and convincing evidence that it would have fired Kuba solely for her allegedly unprotected accusations.[18] *See Shea v. Kohl's Dep't Stores, Inc.*, No. 7:16-cv-01155-TMP, 2019 WL 1452887, at *8–9 (N.D. Ala. Apr. 2, 2019) (distinguishing *Johnson* and denying summary judgment where the employer could not provide similar evidence of prior warnings and negative performance reviews). While DFS may be inclined to point to Dye's executive summary for such corroboration, doing so would prove a tricky tactic, as that summary explicitly references some of the statements from Kuba's June 18 email to Kalogridis that DFS acknowledges are protected. (*See* Doc. 38-45 at 3). By comparison, the district court in *Johnson* relied on the fact that "[t]he reasons advanced by Stein Mart for terminating Johnson's employment [were] convincingly unrelated to Johnson's [protected] complaints." *Johnson*, 2007 WL 1796265, at *5.

Even if DFS could show by clear and convincing evidence that it would have fired Kuba solely for her accusations against Kalso, Martin, and Advisory

---

[18] While the record is replete with instances of Kuba sending ill-tempered and unprofessional messages to her coworkers—including her supervisors—DFS does not argue that it fired Kuba for her vexatious attitude. Instead, DFS argues that it fired her for making three specific accusations, as outlined in Dye's executive summary. And while Kuba's accusation against Kalso—which bore no relation to protected activity—may have justified Kuba's termination by itself, DFS has failed to show by clear and convincing evidence at this stage of the case that it would have fired Kuba for that offense alone. To the contrary, Willis's and Widger's statements suggest that they were motivated to fire Kuba based on all three of her allegations taken together.

& Assurance, this simply raises the question of whether any of those accusations were protected themselves. DFS has stipulated that most of Kuba's June 18 email to Kalogridis constitutes protected activity. (Doc. 39 ¶ 2). It insists, however, that Kuba's specific accusations against Martin and her team at Advisory & Assurance[19] are not protected because they "do not relate to the violation of any law, rule or regulation" outlined in § 1514A. (Doc. 50 at 3). The Court disagrees.

DFS is correct insofar as SOX "does not extend protection to every employee complaint about possible improper or even illegal conduct." *Northrup Grumman Sys. Corp. v. U.S. Dep't of Lab., Admin. Rev. Bd.*, 927 F.3d 226, 229 (4th Cir. 2019). Rather, SOX prohibits retaliation only where "the employee provides information regarding conduct that he or she reasonably believes violates one of six categories listed by Congress in § 1514A(a)(1)." *Id.* at 229–30. "Those categories are mail fraud, wire fraud, bank fraud, securities fraud, any SEC rule or regulation or any federal law relating to fraud against shareholders." *Id.* at 229.

Contrary to DFS's assertion, a jury could fairly determine that Kuba reasonably believed her accusations against Martin and Advisory & Assurance

---

[19] Kuba does not and could not claim that her accusations against Kalso constitute protected activity under SOX. Again, however, DFS has provided no evidence that it would have fired Kuba for those accusations alone.

related to a violation of one of these categories. The gravamen of Kuba's concern is that, by dissolving the role of a centralized "Code Administrator" and diversifying responsibility for mapping and issuing coupon codes, DFS was left with "no internal controls over the accounting system/accounting flow" of noncash media and was therefore "not in compliance with SOX." (Doc. 38-35 at 2; Kuba Dep. at 393). This general complaint, DFS concedes, is protected. It is hard then to understand why Kuba's *specific* complaints that Advisory & Assurance was "simply giving 4-digit [coupon codes] to anyone who wants one," (Doc. 38-35 at 1), or that Martin felt she could "bully" Kuba and "run rough shot [sic] over [her] with setting up codes," (Doc. 38-18 at 1), would not be similarly protected. If anything, Kuba appears to be supplementing her protected statements about a lack of internal controls with specific examples that illustrate her concerns.[20]

---

[20] DFS may argue that Kuba could not have reasonably believed that her accusations against Martin and Advisory & Assurance were related to a violation of relevant law because, as Dye determined, Kuba's description of their conduct was demonstrably untrue. Were a jury to agree with Dye, Willis, and Widger that Kuba could not have reasonably believed that Martin and Advisory & Assurance were engaged in the misconduct that she alleged, this would indeed mean that those accusations would not be protected. But the Court cannot rule at this stage that Kuba's accusations were objectively unreasonable as a matter of law. *See Burns v. Medtronic, Inc.*, No. 8:15-cv-2330-T17-TBM, 2016 WL 3769369, at *4 (M.D. Fla. July 12, 2016) ("If there is any question . . . [that] reasonable minds could disagree about whether [an employee's] belief was objectively reasonable, the issue cannot be decided as a matter of law." (citing *Rhinehimer v. U.S. Bancorp Invs., Inc.*, 787 F.3d 797, 812 (6th Cir. 2015))).

The cases cited by DFS are inapposite. In *Miller v. Stifel, Nicolaus & Co.*, which DFS provided during oral argument on the present motions, a district court in Minnesota held that an employee's mere "complaints about alleged violations of internal company policies [were] not protected activities under SOX." 812 F. Supp. 2d 975, 988 (D. Minn. 2011). Here, however, Kuba did not allege that Martin and Advisory & Assurance were violating internal company policies. To the contrary, she alleged that their actions demonstrated a *lack* of internal company policies that were in fact required under federal securities laws. *See Thomas v. Tyco Int'l Mgmt. Co., LLC*, 262 F. Supp. 3d 1328, 1337 (S.D. Fla. 2017) ("An employee's complaint concerning inadequate internal control over financial reporting can constitute protected activity."). By comparison, none of the employee's allegations in *Miller*—that some of her coworkers "used and sold marijuana," "used [the company's] copy machine for . . . personal printing," "engaged in an affair at the . . . branch office," and "spent too much time traveling"—were even tangentially related to a violation of federal securities laws. 812 F. Supp. 2d at 987. And, significantly, the court in *Miller* found "no evidence that [the employee] 'actually believed the conduct complained of constituted a violation of pertinent law." *Id.* at 988 (quoting *Welch v. Chao*, 536 F.3d 269, 278 n.4 (4th Cir. 2008)).

The remaining cases cited by DFS are similarly unpersuasive, doing little to support its argument that Kuba's allegations are not protected under SOX.

In *Hatmaker v. Memorial Medical Center,* for example, the Seventh Circuit held in an employment retaliation case brought under Title VII that "participation [in a Title VII investigation] doesn't insulate an employee from being discharged for conduct that, if it occurred outside an investigation, would warrant termination." 619 F.3d 741, 745 (7th Cir. 2010).[21] According to the employer in that case, the employee was fired not for participating in an investigation about her boss's alleged sex discrimination but for the employee's "disturb[ing]" and "gratuitous references to Jews, Catholics, Southern Baptists, Don Imus, Al Sharpton, and Jesse Jackson," which she made in the course of that investigation. *Id.* Unlike the employee in *Hatmaker,* Kuba was not "trafficking in stereotypes" or "attributing 'sexist attitudes' to assumed tenets" of her coworkers' religions, *id.* at 746—she was simply reporting what she claimed were examples of lackluster internal controls over noncash media. Whether or not Kuba reasonably believed this claim is a question that the jury will have to decide.

---

[21] Critically, the court in *Hatmaker* acknowledged that its core holding is contradicted by *Pettway v. American Cast Iron Pipe Co.,* 411 F.2d 998 (5th Cir. 1969), a case that remains binding on this Court. *See Bonner v. City of Prichard,* 661 F.2d 1206, 1207 (11th Cir. 1981) (holding that decisions issued by the Fifth Circuit on or before September 30, 1981, are binding precedent in the Eleventh Circuit); *see also Booth v. Pasco Cnty.,* 829 F. Supp. 2d 1180, 1200 (M.D. Fla. 2011) (recognizing that *Pettway* is binding in the Eleventh Circuit). To whatever extent the reasoning of *Hatmaker* is not foreclosed by *Pettway,* the Court is not persuaded.

Finally, the Court rejects DFS's reliance on *Armstrong v. BNSF Railway Co.*, 880 F.3d 377 (7th Cir. 2018), for the proposition that so long as Willis and Widger "honestly believed" that Kuba's accusations against Martin and Advisory & Assurance were made in bad faith—and thus unprotected—DFS could not be held liable for firing her under SOX. As another court acknowledged in a later case, "the only conclusion to be drawn from *Armstrong* is the recognition that it would not be possible to show that an employer retaliated in response to an employee engaging in protected activity if the employer could demonstrate that it honestly believed no protected activity had occurred." *Frost v. BNSF Ry. Co.*, 914 F.3d 1189, 1197 (9th Cir. 2019). Here, however, DFS has already stipulated that Kuba engaged in protected activity when she sent her June 18 email to Kalogridis. The fact that Willis and Widger may have "honestly believed" that certain *parts* of that email were not protected does nothing to show by clear and convincing evidence that DFS would have fired Kuba even in the absence of those parts that were. *See Collins*, 334 F. Supp. 2d at 1380–81 ("It is evident that Plaintiff made numerous complaints to her supervisors, many of which would not constitute protected activity under Sarbanes–Oxley. To allow Defendants to obtain summary judgment by singling out these complaints and insisting that only unprotected complaints were the basis for their action against Plaintiff would thwart the purpose of Sarbanes–Oxley.").

To sum up, a reasonable jury could find that Kuba has established her prima facie case of retaliation under SOX, and DFS has failed to show by clear and convincing evidence that it would have fired Kuba in the absence of her protected activity. Accordingly, DFS's Motion for Summary Judgment (Doc. 38) must be denied as to Kuba's SOX claim.[22]

## B. The Dodd–Frank Act Claim (Count II)

"Passed in the wake of the 2008 financial crisis," the Dodd–Frank Wall Street Reform and Consumer Protection Act (Dodd–Frank) "aim[s] to 'promote the financial stability of the United States by improving accountability and transparency in the financial system." *Digit. Realty Tr., Inc. v. Somers*, 138 S. Ct. 767, 773 (2018) (quoting Pub. L. No. 111-203, § 1, 124 Stat. 1376, 1376 (2010)). Like SOX, Dodd–Frank encourages employees to "blow the whistle" on their employers' financial wrongdoing and shields them from retaliation when they do so—with some important differences. *See* 15 U.S.C. § 78u-6(h).

To establish a prima facie case of retaliation under Dodd–Frank, a plaintiff must show that "(1) [she] engaged in a protected activity, (2) [she] suffered a materially adverse employment action, and (3) the adverse action was

---

[22] Because there are still genuine issues of material fact regarding whether the protected elements of Kuba's June 18 email to Kalogridis were "a contributing factor" in her termination and whether she "reasonably believed" that her accusations against Martin and Advisory & Assurance related to a violation of relevant law, Kuba's Motion for Partial Summary Judgment (Doc. 37) must also be denied.

causally connected to the protected activity." *Thomas v. Tyco Int'l Mgmt. Co., LLC*, 416 F. Supp. 3d 1340, 1367 (S.D. Fla. 2019) (quoting *Hall v. Teva Pharm. USA, Inc.*, 214 F. Supp. 3d 1281, 1289 (S.D. Fla. 2016)). Unlike SOX claims, retaliation claims under Dodd–Frank follow the familiar *McDonnell Douglas* framework used for Title VII claims. Thus, "if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the [adverse action]. . . . [S]hould the defendant carry this burden, the plaintiff must then have an opportunity to prove by the preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for [retaliation]." *Id.* (quoting *Texas Dep't. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252–53 (1981)).

Also unlike SOX, the anti-retaliation provision of Dodd–Frank does not protect the entire genus of busybody employees who voice their concerns about financial malfeasance. Instead, it protects only those who meet the statutory definition of a "whistleblower" under the Act—that is, an "individual who provides . . . information relating to a violation of the securities laws to the [SEC]." § 78u–6(a)(6); *see also Digit. Realty*, 138 S. Ct. at 777. This limitation reflects the "'core objective' of Dodd–Frank's robust whistleblower program," which is to "motivate people who know of securities law violations" not just to tell their supervisors, but *to tell the SEC.*" *Digit. Realty*, 138 S. Ct. at 777

(quoting S. Rep. No. 111–176, at 38 (2010)). Importantly, an employee who does tell the SEC—and thus meets the statutory definition of a whistleblower under Dodd–Frank—is protected from retaliation even for "reports of wrongdoing [made] to an internal supervisor," so long as those reports are "independently safeguarded from retaliation under Sarbanes–Oxley." *Id.* at 774 (citing § 78u–6(h)(1)(A)(iii)); *see also id.* at 779 ("The employee can recover under the statute without having to demonstrate whether the retaliation was motivated by the internal report . . . or by the SEC disclosure.").

DFS does not dispute that Kuba became a "whistleblower" for the purposes of her Dodd–Frank claim once she filed her TCR with the SEC on August 7, 2017. (*See* Doc. 39 ¶ 3). It argues, however, that "Kuba's [Dodd–Frank] claim is fatally defective because she was not a 'whistleblower' when the decision to terminate her employment was made" on July 14, 2017. (Doc. 38 at 19). Of course, by DFS's own admission, Kuba *was* a whistleblower by the time she was actually fired on September 21, 2017.

DFS provides no authority for the proposition that the decision date rather than the termination date matters for the purpose of an employee's Dodd–Frank claim, and the Court is skeptical that it could.[23] Looking at the

---

[23] DFS does offer one case in which a district court dismissed an employee's Dodd–Frank claim because, as DFS characterizes it, the employee "failed to file with the SEC prior to the termination decision." (Doc. 50 at 4 (citing *Slawin v. Bank of Am. Merch. Servs.*, 491 F. Supp. 3d 1334, 1344 (N.D. Ga. 2020))). DFS curiously omits from

plain text of the statute, Dodd–Frank prohibits an employer from "discharg[ing] . . . a whistleblower [for] . . . making disclosures that are required or protected under [SOX]." § 78u–6(h)(1)(A). To the extent that the *decision* to discharge an employee and the implementation of that decision constitute separate actions, Dodd–Frank is clearly concerned with the latter.[24] The Court thus rejects DFS's argument that Kuba was not a whistleblower under Dodd–Frank during the relevant period.

As discussed at length above, genuine issues of material fact exist regarding whether Kuba's termination was causally connected to her undisputed protected activity. And although DFS has attempted to offer a "legitimate, non-retaliatory reason" for terminating Kuba—her accusations against Kalso, Martin, and Advisory & Assurance—the Court has already explained why those accusations themselves may constitute protected activity.

---

its description of that case that the termination decision and the actual termination occurred on the same day—both before the employee filed his complaint with the SEC. (*Slawin*, 491 F. Supp. 3d at 1338). That case is therefore distinguishable.

[24] As a guide for the (potentially) perplexed: the Court found earlier in this Order that the decision date is relevant in assessing Kuba's prima facie case for retaliation under SOX because it goes to an inference of causation. *See supra* Section III.A.1. But it is not relevant in assessing whether she is a "whistleblower" under Dodd–Frank because Kuba is not required to prove that her SEC disclosure was a contributing factor in her termination, only that she made it before she was actually terminated. *See Digit. Realty*, 138 S.Ct. at 777 ("The whistleblower definition [found in § 78u–6(a)(6)] . . . describes *who* is eligible for protection. . . . The three clauses of § 78u–6(h)(1)(A) then describe what *conduct*, when engaged in by a whistleblower, is shielded from employment discrimination.").

Accordingly, DFS's Motion for Summary Judgment (Doc. 38) must be denied as to Kuba's Dodd–Frank claim.

### C. The California False Claims Act Claim (Count III)

In addition to her claims under federal and Florida law, Kuba also brings a claim under the California False Claims Act (CFCA). Modeled explicitly after its federal eponym, the CFCA "establishes a cause of action against persons who submit false claims for money, property, or services to the State of California or its political subdivisions." *Gavriliuc v. TEKsystems, Inc.*, No. 8:20-cv-02164-JLS-DFM, 2021 WL 3568252, at *3 (C.D. Cal. Apr. 14, 2021). More relevant to this case, "[i]t also prohibits retaliation against any employee . . . based on 'lawful acts' done by that individual in furtherance of an action under the CFCA or efforts to stop conduct that violates the CFCA." *Id.* (citing Cal. Gov't Code § 12653(a)).

Like employees pursuing retaliation claims under SOX and Dodd–Frank, an employee seeking to establish a prima facie case of retaliation under the CFCA must show: "(1) that he or she engaged in activity protected under the statute; (2) that the employer knew the plaintiff engaged in protected activity; and (3) that the employer discriminated against the plaintiff because he or she engaged in protected activity." *Id.* (quoting *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1103 (9th Cir. 2008)). The meaning of "protected activity" under the CFCA differs from that of other statutes and is "limited to activities

that reasonably could lead to a [CFCA] action; in other words, investigations, inquiries, testimonies or other activities that concern the employer's knowing submission of false or fraudulent claims for payment to the government." *Id.* (quoting *Wittenbrock v. Sunovion Pharms.*, Inc., No. EDCV 19-342 JVS (SHKx), 2019 WL 4452977, at *3 (C.D. Cal. July 29, 2019)). With that in mind, Kuba's Complaint alleges that she "engaged in protected activity when she objected to and/or reported underreporting and errors in [DFS]'s revenue recognition and sales tax reporting and payments to the State of California" and that she was fired in part because of those objections. (Doc. 1 ¶ 60–69).

As DFS correctly points out, there is a significant problem with Kuba's CFCA claim: the statute does not apply to false "claims, records, and statements" made under California's Revenue and Taxation Code. § 12651(f). Because DFS's purported "failure . . . to collect[,] report[,] and remit proper [tax] payment to the State of California," (Doc. 48 at 19), could not reasonably lead to an action under the CFCA, Kuba's "object[ion] to and/or report[ing of]" that conduct is not protected by the CFCA's anti-retaliation provision.[25] *See Kaye v. Bd. of Trs. of San Diego Cnty. Pub. L. Libr.*, 101 Cal. Rptr. 3d 456, 464–65 (Ct.

---

[25] In a rather half-hearted effort to circumvent the CFCA's tax bar, Kuba states for the first time in her Response that her CFCA claim *actually* rests on DFS's "false claims against its shareholders, among whom is CalPERS, a subdivision thereof." (Doc. 48 at 19). Kuba offers no authority for or explication of this novel legal argument, which the Court therefore rejects.

App. 2009) ("[T]o constitute protected activity under the CFCA . . . it must be reasonably possible for the employee's conduct to lead to a false claims action."); *see also Wilson ex. rel State Bd. of Equalization v. Farmers Ins. Exch.*, No. B188167, 2007 WL 1113332 (Cal. Ct. App. 2007) (unpublished case confirming that § 12651(f) bars a CFCA claim based on the defendant's underreporting of revenue in state tax filings). Accordingly, DFS's Motion for Summary Judgment (Doc. 38) must be granted as to Kuba's CFCA claim.

### D. The Florida Private Whistleblower Act Claim (Count IV)

Florida's Private Whistleblower Act (FWA) provides that "[a]n employer may not take any retaliatory personnel action against an employee because the employee has . . . [o]bjected to, or refused to participate in, any activity, policy, or practice of the employer which is in violation of a law, rule, or regulation." § 448.102(3), Fla. Stat. In familiar fashion, an employee seeking to establish a prima facie case of retaliation under the FWA must show that: "(1) she engaged in statutorily protected expression; (2) she suffered an adverse employment action; and (3) the adverse employment action was causally linked to the protected activity. *Graddy v. Wal-Mart Stores East, LP*, 237 F. Supp. 3d 1223, 1226 (M.D. Fla. 2017) (citing *Kearns v. Farmer Acquisition Co.*, 157 So. 3d 458, 462 (Fla. 2d DCA 2015)). Then, in line with the *McDonnell Douglas* framework, "the burden shifts to the defendant to proffer a legitimate reason for the adverse action," before shifting "back to the plaintiff to prove by a preponderance of the

evidence that the 'legitimate' reason is merely pretext for prohibited, retaliatory conduct." *Sierminski v. Transouth Fin. Corp.*, 216 F.3d 945, 950 (11th Cir. 2000).

Once again, DFS does not dispute that most of Kuba's June 18 email to Kalogridis constitutes protected activity for the purpose of her FWA claim. (Doc. 39 ¶ 2). Instead, DFS revives its argument that Kuba cannot show a causal connection between this protected activity and her termination and that, even if she could, she cannot prove that DFS's legitimate explanation is pretextual. (Doc. 38 at 22–24). But the same argument begets the same response. Because genuine issues of material fact exist regarding whether Kuba's termination was causally connected to her undisputed protected activity, and because DFS's purportedly legitimate reason for Kuba's firing may itself constitute protected activity, DFS's Motion for Summary Judgment (Doc. 38) must be denied as to Kuba's FWA claim.

### E. **The Equal Pay Act Claim (Count V)**

In addition to the retaliation claims stemming from her firing, Kuba alleges in her Complaint that DFS violated the Equal Pay Act during her tenure at the company by paying her less than her similarly situated male coworkers. (Doc. 1 ¶ 69–79). "Under the Equal Pay Act, employers may not pay their employees at different rates for the same work based on sex." *Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1313 (11th Cir. 2018) (citing 29 U.S.C. § 206(d)(1)). To establish a prima facie case, the employee must show that "the

employer paid employees of opposite genders different wages for equal work for jobs which require 'equal skill, effort, and responsibility, and which are performed under similar working conditions.'" *Steger v. Gen. Elec. Co.*, 318 F.3d 1066, 1077–78 (11th Cir. 2003) (quoting *Irby v. Bittick*, 44 F.3d 949, 954 (11th Cir.1995)). "Once the employee presents a prima facie case, the employer may avoid liability by proving by a preponderance of the evidence that the pay differences are based on '(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) . . . any other factor other than sex.'" *Id.* at 1078 (quoting 29 U.S.C. § 206(d)(1)).

According to DFS, "Kuba has not produced and cannot produce any evidence establishing substantial similarity of work between her and the two male alleged comparators . . . she has identified." (Doc. 38 at 24–25). In fact, Kuba has not even tried to do so, failing to defend her Equal Pay Act claim in her Response to DFS's Motion for Summary Judgment. (*See* Doc. 48). Accordingly, DFS's Motion must be granted as to that claim. See *Jones v. Bank of Am., N.A.*, No. 1:12-cv-3855-TCB, 2013 WL 12092557, at *2 (N.D. Ga. Apr. 19, 2013) ("When a party fails to respond to an argument or otherwise address a claim, the Court deems such argument or claim abandoned." (quoting *Hudson v. Norfolk S. Ry. Co.*, 209 F. Supp. 2d 1301, 1324 (N.D. Ga. 2001))).

## IV.   CONCLUSION

For the foregoing reasons it is **ORDERED** as follows:

1.   Kuba's Motion for Partial Summary Judgment (Doc. 37) is **DENIED**.

2.   DFS's Motion for Summary Judgment (Doc. 38) is **GRANTED** as to Count III and Count V of Kuba's Complaint. In all other respects, that Motion is **DENIED**.

**DONE** and **ORDERED** in Orlando, Florida, on August 24, 2022.

JOHN ANTOON II
United States District Judge

Copies furnished to:
Counsel of Record

44