## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

SANDRA KUBA,

     Plaintiff,

v.                          Case No. 6:21-cv-312-JA-LRH

DISNEY FINANCIAL
SERVICES, LLC,

     Defendant.

_____/

## DEFENDANT'S TRIAL BRIEF

Defendant, DISNEY FINANCIAL SERVICES, LLC ("DFS"), by and through its undersigned counsel, and pursuant to this Court's Case Management and Scheduling Order dated May 26, 2021 (Doc. 26), files its Trial Brief.  This brief focuses on the primary legal issues that DFS expects to arise during the course of the trial.

## INTRODUCTION

Three counts remain from Plaintiff Sandra Kuba's complaint against DFS: (1) retaliation under the Sarbanes-Oxley Act, 18 U.S.C. §1514A ("SOX") (Count I), (2) retaliation under the Dodd-Frank Wall Street Reform and Consumer Protection Act, 15 U.S.C. §78u-(h) ("DFA") (Count II), and (3) retaliation under the Florida Whistleblower Act, Fla. Stat. § 448.101 ("FWA") (Count IV).

Each of these claims arises out of the July 14, 2017 decision of Tracy Willis and Andrew Widger to terminate Kuba's employment based on their determination

that she had made accusations of mistreatment and wrongdoing against multiple coworkers without a good faith reasonable basis in violation of company policy. Specifically, the accusations were that: (1) co-worker Channing Kalso "screamed" at her and talked down to her "very badly – to the point of abuse" (contained in Ms. Kuba's June 2, 2017 email to Employee Relations); (2) "This Manager in Advisory & Assurance and her team are not setting up codes. They are simply giving 4-digit numbers to anyone who wants one" (contained in Kuba's June 18, 2017 email to George Kalogridis and Scott Leingang)[1]; and (3) "You helped to hold me down with little to no raises, promotions, and bogus 90-day plans so that I am too low in the organization to fight any of this. That is one reason why Danette Martin feels she can bully me and run rough shot over me with setting up codes" (contained in Kuba's June 18, 2017 email to Employee Relations) (collectively, the "Accusations").

Kuba claims that DFS terminated her employment in retaliation for her engaging in protected activity under SOX, DFA, and the FWA. After Kuba concludes her direct case, the established evidence will demonstrate that, as a matter of law, DFS is entitled to a directed verdict, and should Kuba somehow avoid a directed verdict, at the close of the case, that DFS, is entitled to a verdict in its favor.

## MEMORANDUM OF LAW

---

[1] DFS does not contest that the contents of Kuba's September 29, 2016 email to George Kalogridis or the remainder of her June 18, 2017 email to Kalogridis and Leingang qualify as protected activity under SOX and/or the FWA.

## I.   ELEMENTS OF SOX CLAIM

It is well-established that a two-part allocation of proof applies to SOX retaliation claims.  First, the plaintiff must establish a *prima facie* case by showing, "by a preponderance of the evidence, that '(i) the employee engaged in a protected activity or conduct, (ii) the [employer] knew or suspected, actually or constructively, that the employee engaged in the protected activity; (iii) the employee suffered an unfavorable personnel action; and (iv) the circumstances were sufficient to raise the inference that the protected activity was a contributing factor in the unfavorable action." *Thomas v. Tyco Int'l Mgt. Co.,* 416 F. Supp. 3d 1340, 1357 (S.D. Fla. 2019) (granting summary judgment for employer). If the plaintiff satisfies this burden, then the employer must demonstrate by clear and convincing evidence that it would have taken the same personnel action in the absence of the protected activity. *Id.*

### A.   Kuba Will Be Unable to Prove That Her Accusations Qualify as Protected Activity as A Matter of Law

DFS contends that it based its termination decision solely on the determination of Willis and Widger that Kuba's accusations of mistreatment and wrongdoing against Kalso, Danette Martin, and unspecified employees in Advisory & Assurance ("A&A") were without a good faith reasonable basis in violation of company policy. Therefore, if the Accusations do not qualify as protected activity, and if the jury finds (or the Court on a directed verdict motion determines) that they are the sole reason for the discharge, then DFS cannot be liable under SOX.  The Accusations are not protected activity under SOX as a matter of law.

SOX protects employees who have both a subjective and objectively reasonable belief that their employer has violated one of six enumerated categories under the statute, every one of which relates to fraud. 18 U.S.C. §1514A (entitled "Civil action to protect against retaliation in fraud cases"); *Northrop Grumman Sys. Corp. v. U.S. Dept. of Lab., Admin. Rev. Bd.,* 927 F.3d 226, 229 (4th Cir. 2019); *Miller v. Stifel, Nicolaus & Co., Inc.,* 812 F. Supp. 2d 975 (D. Minn. 2011) ("Only activity 'definitively and specifically related to one of the six enumerated categories of misconduct'…is protected by SOX."). And because fraud requires an intention to defraud, Kuba's statements must relate to an intention to defraud. *See Northrop* at 233 ("Shareholder fraud involves false representations…*intended* to deceive…" [emphasis added]).

Kuba claims that the Accusations are actually complaints about alleged violations of the following SEC rules or regulations:

- SOX, 15 U.S.C. § 7262 (known as SOX Section 404) and its implementing Rule 17 CFR 240.13a-15 – Controls and Procedures – requiring the SEC to prescribe rules requiring each annual report to contain an internal control report, which states the responsibility of management for maintaining an adequate internal control structure and procedures for financial reporting and contains an assessment of the effectiveness of the internal control structure and procedures;

- 15 U.S.C. § 78m(b)(2)(B)(i-ii) (known as Section 13(b)(2)(B) of the Securities and Exchange Act of 1934) – requiring employers to maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions are executed in accordance with management's general or specific authorization, and are recorded as necessary to permit preparation of financial statement in conformity with GAAP and to maintain accountability; and

- 15 U.S.C. §78m(b)(5) (known as Section 13(b)(5) of the Securities Exchange Act) – prohibiting any person from "knowingly circumvent or knowingly fail to implement a system of internal accounting controls or knowingly falsify any book, record, or account described in paragraph 2."

On their face, none of the Accusations has anything to do with either a subjective or objectively reasonable belief of a lack of internal controls as defined under SOX.[2]   In fact, the evidence at trial will show that Kuba's role involved dealing with accounting codes as utilized at the very first entry of a code into the company's accounting systems by a company employee, specifically with respect to what she calls "non cash media" (meaning coupons). Kuba had no visibility, involvement in, or responsibility for internal controls as understood within the meaning of SOX, which were handled by a separate SOX control team.

The evidence at trial will establish that Kuba's Accusations that A&A was "not setting up codes" and was "simply giving 4-digit numbers to anyone who wants one" were based on nothing more than a one-time mistake made in connection with a "Magic Backstage" coupon—a mix-up between a discount code and a charge code involving a $79 coupon. As a matter of law, this simply will not support a finding that the statements reflect both a subjective and objectively reasonable belief of shareholder fraud.  Indeed, after investigation, Employee Relations Manager Marisa Dye determined that Kuba's Accusations were objectively <u>false</u> and without reasonable basis.  Likewise, as a matter of law, Kuba's Accusation that Danette Martin "bullied" her and ran "rough shot" over her will not support a finding that the statements reflect both a subjective and objectively reasonable belief of shareholder fraud.

---

[2] This court has already ruled that the accusations against Kalso are not protected under SOX. (Doc. 60 at fn 19).

In sum, at the close of Kuba's direct case, it will be indisputable that the Accusations do not qualify as protected activity as a matter of law.

### B.   Kuba Will Be Unable to Establish the Contributing Factor Element of Her Prima Facie Case

As has been recognized by many courts, most recently by the Second Circuit in early August 2022, in order to establish the "contributing factor" element of the prima facie case for violation of the SOX whistleblower provision, a plaintiff must prove that the employer took the adverse employment action with retaliatory intent. In *Murray v. UBS Securities, LLC*, 43 F.4th 254, 260, 2022 WL 3130522 (2d Cir. Aug. 5, 2022), the Second Circuit vacated a jury verdict under SOX and remanded for a new trial because the district court failed to instruct the jury that a SOX retaliation claim requires a showing of retaliatory intent. The court based its conclusion on the plain meaning of the statutory language, which prohibits employers from discriminating "because of" protected activity. The court further analyzed "nearly identical language" from the Federal Railway Safety Act ("FRSA"). Citing numerous other cases, the court concluded that the FRSA required some showing of retaliatory intent.[3] Indeed, the court noted that the Second, Seventh, and Eighth Circuits all require a showing of retaliatory intent under that analogous statute. *Id*. at n.7.[4]

---

[3] *Tompkins v. Metro-N Commuter R.R. Co.,* 983 F.3d 74 (2d Cir. 2020); *Armstrong v. BNSF Ry. Co.*, 880 F.3d 377 (7th Cir. 2018).

[4] The court noted that *Frost v. BNSF Rw. Co.*, 914 F.3d 1189 (9th Cir. 2019), upon which Kuba relies, did not require this showing, and that some circuits had declined to rule. Notably, as the court explained in *Yowell v. Admin. Rev. Bd., U.S. Dept. of Lab.*, 993 F.3d 418, 423 (5th Cir. 2021), the case

Moreover, in *Grantham v. CSX Transportation, Inc.,* 2022 WL 677575, \*5 (S.D. Ga. Mar. 7, 2022), the Southern District of Georgia followed this same approach in an FRSA case. Citing *Armstrong* and multiple other cases from the Second, Fourth, Fifth, Sixth, Seventh, and Eighth Circuits, the court held that the intentional retaliation standard was the correct one to apply, and noted that an employee's protected activity did not insulate him from discipline for misconduct that becomes known at the time or while addressing the protected activity.

Here, Kuba will be unable to carry her burden of proving that that decision makers Willis and Widger intentionally retaliated against her. They decided to terminate Kuba's employment because they determined that she had made accusations of mistreatment and wrongdoing against multiple coworkers without a good faith reasonable basis in violation of company policy.

### C.   Kuba Will Be Unable to Prove That Willis and Widger Did Not Honestly Believe Kuba's Actions Warranted Her Termination, and This Disposes of Her Claims

Part and parcel of the requirement that a plaintiff must prove retaliatory intent is the corollary—an employer cannot have a retaliatory motive if it honestly believes that the plaintiff's complaints were without a good faith reasonable basis in violation of company policy. In such an instance, the employer is acting as a result of the employee's misconduct of bringing bad faith complaints, not because of protected

---

upon which *Frost* relied, *Araujo v. N.J. Transit Rail Operations, Inc.*, 708 F.3d 152, 158 (3d Cir. 2013), was decided prior to the Administrative Review Board *abandoning* the lenient "inextricably intertwined" and "chain of events" analysis of the contributing factor element in favor of an analysis that requires proof of retaliatory intent.

activity. This is true even where the underlying complaint, if true, could have been protected activity.[5] The policy of SOX—like any other whistleblower statute—cannot be to protect those who make complaints without a good faith reasonable basis in violation of company policy, and terminating someone for doing so, as a matter of logic, is not retaliation for protected activity.

As the Seventh Circuit recognized in *Armstrong*, because the FRSA requires a showing of retaliatory intent, a jury should be instructed that that the employer "could not be liable if its decision was based on its honest belief that [plaintiff] did not make a complaint in good faith. That is simply another way of saying that BNSF could not be liable if it was not motivated by retaliation." 880 F.3d at 382.

*Frost*, relied upon by Kuba, does not require any different result. In the first instance, and going against case law in multiple circuits, the Ninth Circuit in *Frost* rejected the requirement that a plaintiff prove retaliatory motivation in an FRSA case. Nonetheless, even *Frost* recognized that *Armstrong's* honest belief instruction was not improper because "it would not be possible to show that an employer retaliated in response to … protected activity if the employer could demonstrate that it honestly believed no protected activity had occurred." *Frost* at 1197. That is precisely the situation here. Willis and Widger honestly believed Kuba had accused multiple coworkers of mistreatment and wrongdoing without a good faith reasonable

---

[5] The Court, in its summary judgment order, viewed this issue through the lens of whether Kuba could have had a reasonable belief that the behavior described in the Accusations violated SOX, because, as Dye determined, "Kuba's description of their conduct was demonstrably untrue." As the Court noted, were a jury to agree with Dye, Willis, and Widger, then the Accusations would not be protected.  Doc. 60 at 31, n. 20.

basis in violation of company policy, and made the decision to terminate her employment for this reason. Even under *Frost*'s construction, they could not have engaged in retaliation.

Based on her admission in her deposition, Kuba will admit at trial that she has no evidence to dispute that Willis and Widger honestly believed she acted without good faith in accusing Kalso and Martin of mistreating her and A&A of handing out codes to whomever wanted them. *See* SK 332:19-333:11. Kuba's inability to genuinely contest that Willis and Widger based the termination decision on their honestly held belief will be fatal to all of her claims. *See also Johnson v. Stein Mart, Inc.*, 440 F. App'x 795, 802 (11th Cir. 2011) (affirming summary judgment on SOX retaliation claim, and holding "'It is well settled . . . that for an employer to prevail, the jury need not determine that the employer was correct in its assessment of the employee's performance; it need only determine that the defendant in good faith believed plaintiff's performance to be unsatisfactory.'" (citation omitted).)

### D. The Portions of the June 18 Email that DFS Does Not Contest as Protected Activity Do Not Immunize Kuba from Discipline Based on Her Bad Faith Accusations in That Email.

Kuba's violation of company policy by accusing multiple coworkers of mistreatment and wrongdoing without a good faith reasonable basis is not excused merely because they were expressed in the same breath as other statements by Kuba that DFS does not contest were protected. Indeed, courts construing the analogous statute, the FRSA, reject the contention that unprotected conduct, even if factually "inextricably intertwined" or part of the same "chain of events" as other protected

9

statements, transforms the unprotected expressions into protected ones. As explained by the Fifth Circuit in *Yowell v. Admin. Rev. Bd., U.S. Dept. of Lab.*, 993 F.3d 418, 423 (5th Cir. 2021), in 2020 the Administrative Review Board (ARB) abandoned the prior doctrine that an employee could show a contributing factor by claiming that the protected activity was "inextricably intertwined" with the protected activity. Citing multiple court opinions, the Fifth Circuit held,

> Under the FRSA, when an employee engages in a protected activity such as reporting a workplace injury, that employee is not insulated from what would otherwise be appropriate discipline for misconduct that becomes known to the employer at that time or during the course of the employer's addressing the protected activity… an employee may not rely solely on the fact that a protected activity is what informed the employer of wrongdoing.

*See also Dakota, Minnesota & E. R.R. Corp. v. U.S. Dept. of Lab. Admin. Rev. Bd.*, 948 F.3d 940, 946 (8th Cir. 2020) ("By ruling that this factual connection was sufficient to satisfy the contributing factor causal element of an FRSA claim, the ARB in essence held that an employee can be free of discipline and recover FRSA damages simply by disclosing misconduct of which the employer is otherwise unaware in a report that will be considered protected FRSA activity. It is well settled that 'employees cannot immunize themselves against wrongdoing by disclosing it in a protected-activity report.'") (citing and quoting *BNSF R. Co. v. U.S. Dept. of Lab.*, 816 F.3d 628 (10th Cir. 2016)).

Similarly here, despite the portions of the June 18 email that are not challenged as protected activity, the indisputable fact is that Willis and Widger honestly believed that Kuba's accusations against her coworkers, including that

A&A was handing out 4-digit codes to anyone who wanted one and that Martin had bullied her, were not made with a good faith reasonable basis in violation of company policy.  SOX, and the policy behind it, surely does not protect an employee and encourage them to make bad faith, baseless accusations against their co-workers.[6]

### E.     Clear and Convincing Evidence Will Show that Kuba Would Have Been Terminated Regardless of any Protected Activity

Regardless at what point of the allocation of proof these issues are considered, that is, at the prima facie stage or the affirmative defense stage, Kuba's SOX claim fails because either (1) the Accusations are not protected activity because Kuba could not have subjectively or objectively reasonably believed them to be true, or (2) if protected, Willis and Widger honestly believed the Accusations to be in bad faith. In the latter case, she was not terminated because of protected activity: she was terminated because she made bad faith accusations in violation of company policy. In other words, as discussed above, she would have been terminated for making bad faith accusations whether or not those accusations qualified as protected activity.

## II.    THE DFA CLAIM:  KUBA WAS NOT A "WHISTLEBLOWER" WHEN THE TERMINATION DECISION WAS MADE

Dodd-Frank exposes an employer to significantly greater financial penalties than SOX does, and accordingly, places greater burdens on plaintiffs who seek to profit from its "double back pay" damages provision. Not only does DFA follow the more stringent *McDonnell-Douglas* proof model, but it also requires an employee to

---

[6] Neither can the policy behind DFA be said to encourage employees to make such accusations.

have made a report to the SEC before they can qualify as a whistleblower for purposes of protection under the DFA anti-retaliation provision. *See Digital Realty Trust, Inc. v. Somers*, 138 S. Ct. 767, 777 (2018). Kuba's DFA claim is fatally defective because she was not a "whistleblower" at the time of the alleged retaliation, which, as a matter of law, occurred when the decision to terminate her employment was made on July 14, 2017—more than three weeks *before* Kuba made her report to the SEC. The fact that Kuba herself delayed the notification of her termination until after she had contacted the SEC by going out on a medical leave does not allow her to manufacture whistleblower status.

In *Slawin v. Bank of Amer. Merch. Serv.,* 491 F. Supp. 3d 1334 (N.D. Ga. 2020), the court analyzed *Digital Realty* and held that an employee <u>must</u> have reported to the SEC by the "time of the alleged retaliation." There, the employee objected to destroying emails as requested by her employer, and was terminated the next day, which was the same date he filed a complaint with the SEC. The court dismissed the DFA claim because he "was not a whistleblower at the time of the alleged retaliation." Similarly, in *Frye v. Anadarko Petroleum Corp.,* 953 F.3d 285 (5th Cir. 2019), the court held that only retaliation that occurred <u>after</u> an SEC report triggered whistleblower protection under DFA. Because the retaliation that occurred between the report and the plaintiff's decision to resign was insufficient to support her constructive discharge claim, the court affirmed the dismissal of her DFA claim.

For purposes of retaliation claims, courts routinely hold that it is the time that the adverse employment decision *was made* rather than the date the adverse action is

communicated that matters.[7] Moreover, numerous courts have found this to be the case even when, like the DFA, the relevant statutory language only mentions "discharge" and not "decision to discharge" or "discriminate" and not "decision to terminate."[8] The rationale for these cases is obvious: employees anticipating an adverse employment action should not be able to take advantage of the reasonable time between the decision and the communication of the action or, as Kuba did here, should not be able to avoid being informed of the adverse action by going out on a medical leave, so that they can create the illusion of having engaged in protected activity before the adverse employment action.[9]

---

[7] *Cf., Godwin v. Corizon Health,* 732 F. App'x 805, 809 (11th Cir. 2018) ("Although Godwin filed an EEOC charge against Corizon in March 2014 and was terminated only one month later, in April 2014, it was undisputed that the decisionmakers, Gibson and Baugh, made their recommendation to terminate Godwin in February 2014."); *Fonte v. Lee Meml. Health System,* 2020 WL 4596872, *4 (M.D. Fla. Aug. 11, 2020), *aff'd,* 2021 WL 5368096 (11th Cir. Nov. 18, 2021); *Blackwell v. Alliant Techsystems, Inc.,* 822 F.3d 431, 436-437 (8th Cir. 2016) ("Before she initially called the ethics hotline, ATK had already suspended her for elbowing Yardley. Human resources manager Baker completed his investigation on March 20, 2012, two weeks before Blackwell was fired. Blackwell did not contest the fact that human resources Baker had completed his investigation and a detailed termination request form prior to her April 4 termination date."); *Brown v. Diversified Distrib. Sys., LLC,* 801 F.3d 901, 908 (8th Cir. 2015) (finding plaintiff failed to establish *prima facie* FMLA discrimination claim where adverse employment action had been contemplated by employer prior to employee's protected activity of taking FMLA leave); *Wright v. St. Vincent Health System,* 730 F.3d 732, 738 (8th Cir. 2013) (affirming judgement in favor of employer on employee's Title VII retaliation claim where evidence established "that the decision to terminate Ms. Wright was made on July 9th before [Wright] called Mr. Cockrell and alleged racial discrimination.").

[8] *See* 42 U.S.C.A. § 2000e-3 (Title VII anti-retaliation provision; notably, it states an employer may not "discriminate" because of employee's protected conduct, and it does not state "decide to discriminate."); nevertheless, courts have focused on the moment the decision to terminate was made as the operative event. *See* Title VII retaliation cases cited in footnote 11.

[9] *See Alvarez v. Royal A. Developers, Inc.,* 610 F.3d 1253, 1270 (11th Cir. 2010) ("We emphasize that Title VII's anti-retaliation provisions do not allow employees who are already on thin ice to insulate themselves against termination or discipline by preemptively making a discrimination complaint."); *Fonte v. Lee Meml. Health System,* 2020 WL 4596872 at *4 ("FMLA leave is not an impenetrable shield from a termination an employer is already investigating and contemplating.")

In another analogous setting, courts hold that a cause of action accrues for purposes of statute of limitations at the point where the plaintiff is on notice that the employer has already decided to take an adverse act. *Hodge v. Fed. Exp. Corp.*, 2015 WL 5440349 at *10 (M.D. Fla. Sept. 15, 2015); *Bouazizi v. Hillsborough County,* 2019 WL 2247692 at *3 (M.D. Fla. May 24, 2019).  Here, the evidence will show that Kuba believed that the decision to terminate her employment had been made, and that she took action to avoid being notified of her termination until after she had contacted the SEC. Kuba's avoidance tactics are of no avail.  The decision to terminate her employment and actions to communicate that decision occurred before she went to the SEC.  As a matter of law, there was no DFA retaliation, and therefore, DFS will be entitled to a directed verdict on Kuba's DFA claim.

## III.  ELEMENTS OF DFA AND FWA CLAIMS

Even assuming Kuba could qualify as whistleblower under the DFA, she will be unable to avoid a directed or final verdict on that claim or her FWA claim. The order and allocation of proof for a DFA claim and a FWA claim are the same. Under each of those statutes, Kuba must prove that her alleged protected activity was the sole, *but for* cause of her termination. *See Hall v. Teva Pharmaceutical USA, Inc.*, 214 F. Supp. 3d 1281, 1288-89 (S.D. Fla. 2016) (applying *McDonnell-Douglas* to both FWA and DFA claims). Kuba bears the burden of proof of establishing a *prima facie* case of retaliation. *Id*. If she does so, DFS must articulate a legitimate non-retaliatory reason for its action. Kuba then bears the ultimate burden of proving that the articulated reason for her termination is false and that the real reason is unlawful

retaliation. *Id.*; *see also Chaudhry v. Adventist Health System Sunbelt, Inc.*, 305 So. 3d. 809, 817 (Fla. 5th DCA 2020) (adopting "*sole*" or "'*but for*'" test for FWA retaliation claims); *Lapham v. Walgreen Co.,* 2021 WL 716630 (M.D. Fla. Jan. 14, 2021) (granting summary judgment to employer on motion for reconsideration under FWA; while plaintiff may have shown that protected activity was a motivating factor, her poor performance was an "independent, non-retaliatory basis for her termination"); *Mitchem-Green v. MHM Health Professionals, Inc.,* 2022 WL 1122858, *4 (11th Cir. Apr. 15, 2022) (affirming summary judgment to employer under FWA where plaintiff could not show that the reason for firing her was false or that retaliation was the real reason).

For the same reasons set forth above with respect to the SOX claim, which (unlike DFA or FWA) shifts the burden to DFS if Kuba is able to establish a prima facie case, Kuba will be unable to prove by a preponderance of the evidence that illegal retaliation against her was the sole, but for cause of her termination.

## IV.  KUBA MUST ESTABLISH THAT HER ACCUSATIONS AGAINST HER CO-WORKERS DESCRIBED CONDUCT THAT ACTUALLY VIOLATED A LAW, RULE, OR REGULATION

In determining what constitutes protected activity, the FWA imposes an additional requirement on a plaintiff. In order to engage in statutorily protected activity under the FWA and avail herself of its protections, a plaintiff must object to an *actual* violation of law, not merely a suspected violation of law.[10] *See, e.g., Graddy*

---

[10] Florida courts are divided on whether the FWA requires a plaintiff to allege that she objected to an actual violation of a law, rule, or regulation, as contemplated in *Kearns v. Farmer Acquisition Co.*,

*v. Wal-Mart Stores East, LP*, 237 F. Supp, 3d 1223, 1227-28 (M.D. Fla. 2017) (Antoon, J.) (granting summary judgment for employer where long-term employee was terminated for criticizing company policy on billing fraudulent prescriptions that she believed was unlawful, but it was not).

Thus, regardless of whether Accusations are determined to qualify as protected activity under SOX and DFA, they will not qualify as protected activity under the FWA, unless Kuba presents evidence that the conduct at issue in the Accusations, *i.e.*, A&A allegedly handing out 4-digit codes to anyone who wanted one and alleged bullying by Martin, constitute an actual violation of a law, rule, or governmental regulation. Kuba will be unable to satisfy her burden of proof under the FWA for this additional reason.

## V.   **DAMAGES**

### A.   **DFS WOULD HAVE TERMINATED KUBA FOR HER MISAPPROPRIATION AND DISCLOSURE OF CONFIDENTIAL INFORMATION AND DOCUMENTS IN VIOLATION OF COMPANY POLICY AND HER CONFIDENTIALITY AGREEMENT**

In its Answer and Affirmative Defenses (Doc. 34), DFS has asserted an after-acquired evidence defense. This affirmative defense "allows an employer to cut off its

---

157 So. 3d 458, 462-65 (Fla. 2d DCA 2015), or permits a plaintiff to allege only that he had a good faith, objectively reasonable belief that the actions to which he objected were illegal, as determined in *Aery v. Wallace Lincoln-Mercury, LLC*, 118 So. 3d 904, 906 (Fla. 4d DCA 2013). Notwithstanding this, this Court has specifically ruled that the *Kearns* actual violation standard applies. *Graddy v. Wal-Mart Stores East, LP*, 237 F. Supp. 3d 1223, 1227-28 (M.D. Fla. 2017) (concluding that the Florida Supreme Court would adopt *Kearns*); *see also, Gonzalez v. GEO Group, Inc.*, 2018 WL 7144484, at *2 (S.D. Fla. Dec. 21, 2018) (stating that "the majority of courts [require] ... that the activity, policy or practice objected to is, in fact, in violation of a law, rule or regulation, not merely that the employee reasonably believed that the actions he objected to were in violation of a law, rule, or regulation"); *Obukwelu v. Tallahassee Mem'l Healthcare, Inc.*, 2015 WL 11110552, at *3 (N.D. Fla. June 25, 2015) (same).

backpay liability for employment discrimination if it later discovers that the employee engaged in wrongdoing 'of such severity that the employee in fact would have been terminated on those grounds alone if the employer had known of it at the time of the discharge.'" *Garner v. G.D. Searle Pharm. Co.*, 581 F. App'x. 782, 785 (11th Cir. 2014) (discussing the affirmative defense in the context of employee's discrimination and retaliation claims) (citing and quoting *McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352 (1995)); *See also Crapp v. City of Miami Beach,* 242 F.3d 1017, 1021 (11th Cir. 2001) (upholding district court's application of after-acquired evidence doctrine to vacate award of backpay). Moreover, after-acquired evidence can preclude any award of front pay or reinstatement to an employee. *Crapp v. City of Miami Beach, id.* ("neither reinstatement nor frontpay generally is appropriate, and backpay should be limited to the point when the employer discovered the after-acquired evidence."). In sum, when applicable, the after-acquired evidence doctrine means that "[t]he beginning point in the trial court's formulation of a remedy should be calculation of backpay from the date of the unlawful discharge to the date the new information was discovered." *McKennon* at 362.

The evidence will establish that throughout her employment with DFS, Kuba was party to "The Walt Disney Company and Associated Companies Confidentiality Agreement" (the "Confidentiality Agreement"). In addition, the evidence will establish that throughout her employment with DFS, Kuba was subject to the policies in the The Walt Disney Company and Affiliates Employee Policy Manual and the Standards of Business Conduct (the "Policies"). In the

Confidentiality Agreement, Kuba promised not take company confidential documents without authorization from DFS and to return all company documents upon the termination of employment.  The evidence will establish that the Policies also prohibit taking company confidential documents without authorization from DFS and require the return of all company documents upon the termination of employment.  They also prohibit sharing confidential information and documents with other employees who do not have a business need to have the information or documents.  In addition, the evidence will establish that employees have been terminated for violation of the Policies.

During discovery in this case, Kuba produced documents containing confidential DFS business information.  These documents revealed that, without authorization from DFS, Kuba had sent confidential information from her DFS company email account to her outside, unsecured personal email account,[11] and, without authorization from DFS, Kuba had sent emails containing confidential information to lower level co-worker friends who did not have a business need to see or possess that information.[12] Her actions were in violation of the Policies and in breach of the Confidentiality Agreement.   SK 80:5-25; SK 237:9-25; 238:1-17; 239:16-25; 240:1-25; 241:1-17.

The evidence will establish that if DFS were aware of Kuba's violation of the

---

[11] Such documents include, for example: Kuba000165-166, Kuba000122-123, and Kuba000466-469.

[12] SK 238:15-23; Kuba also produced Kuba000165-166, an email chain where she emailed confidential internal DFS emails to her personal email on March 19, 2015, more than two and a half years prior to her termination on September 21, 2017.

Policies and breach of her Confidentiality Agreement during her employment, she would have been terminated like others who have similarly violated the Policies.

*McKennon, supra*, is on point.   In that case, the plaintiff admitted in her deposition that she had 1) "copied several confidential documents bearing upon the company's financial condition;" 2) she "took the copies home;" and 3) she misappropriated the financial documents because "an apprehension she was about to be fired because of her age. When she became concerned about her job, she removed and copied the documents for 'insurance' and 'protection.'" *Id* at 355.

Therefore, in the event that DFS is found liable on any of Kuba's claims, as a matter of law, any back pay award must be limited to the period between her termination and the date that DFS discovered the after-acquired evidence, and any award of front pay or request for reinstatement must be denied.

## B.    SOX

Damages under SOX include reinstatement, back pay with interest, and "compensation for any special damages[13] sustained as result of the discrimination, including litigation costs, expert witness fees, and reasonable attorney fees." 18 U.S. Code § 1514A(c). There is no mention of any non-economic damages other than reinstatement.

---

[13] These "special damages" are not an open-ended category of damages, but rather should be limited to relief similar to the specifically listed damages of litigation costs, expert witness fees, and reasonable attorney fees. *Schmidt v. Levi Strauss & Co.*, 621 F. Supp. 2d 796, 805 (N.D. Cal. 2008) ("Although the enumerated relief in § 1514A(c)(2)(C) is prefaced with the term "including," which might suggest a non-exhaustive list of potential monetary relief…the court finds that any additional remedies not mentioned would be limited to similar relief to make the employee whole…Thus, the court construes § 1514A to limit any relief under the "special damages" category to remedies that are restitutionary in nature or otherwise intertwined with the reinstatement remedy.").

Moreover, damages under SOX are a question for the court to decide. Kuba has already conceded that if she prevails, the remedy of reinstatement, or alternatively front pay in lieu of reinstatement, are equitable in nature and should be decided by the Court. This concession requires that the Court decide all potential requests for damages in connection with Kuba's SOX claim if she were to prevail in that claim because all relief under SOX is equitable and not legal[14]. *See Schmidt v. Levi Strauss & Co.*, 621 F. Supp. 2d 796, 805 (N.D. Cal. 2008) (stating in the context of SOX "It is true, as defendants argue, that remedies of reinstatement, hiring, and back pay are generally equitable remedies"); *Van Asdale v. Intl. Game Tech.*, 3:04-CV-703-RAM, 2010 WL 1490349 at *5-6 (D. Nev. Apr. 13, 2010) (citing and adopting *Schmidt*); *Pruett v. BlueLinx Holdings, Inc.*, 2013 WL 6335887 at *2-3 (N.D. Ga. Nov. 12, 2013) (stating in the context of a Dodd-Frank Act retaliation claim that "reinstatement, hiring, and back pay are generally considered equitable remedies…If the purpose of the remedies is to make the employee 'whole,' then they are equitable remedies" and further stating that SOX remedies mirror DFA remedies).

Courts routinely hold that equitable remedies are for courts to decide rather than a jury. *Ford v. Citizens and S. Nat. Bank, Cartersville*, 928 F.2d 1118, 1122 (11th Cir. 1991) ("Purely equitable claims, even those involving factual disputes, are matters to be resolved by the court rather than a jury."); *Kovelesky v. First Data Corp.*,

---

[14] While SOX was amended in 2010 to provide for a right to jury trial, *see Pruett v. BlueLinx Holdings, Inc.,* 2013 WL 6335887 at *2-3 (N.D. Ga. Nov. 12, 2013*)*, this addition did nothing to change the *equitable nature of the remedies* under SOX. DFS maintains that while Kuba is entitled to a jury trial on liability under SOX, damages under SOX should nevertheless be reserved for the Court to decide.

534 F. App'x 811, 815 (11th Cir. 2013) ("Claims that are purely equitable in nature should be decided by a court, not by a jury."); *Galbreath v. Hale County, Alabama Commn.*, 2017 WL 3402964 at *2 (S.D. Ala. Aug. 8, 2017) ("It is within the sound discretion of a district court whether to award equitable relief… .A court decides 'the propriety of equitable relief based on the facts as found by the jury.'")

### C.   DFA

For a prevailing plaintiff on a DFA claim, the law provides the following potential remedies: reinstatement, "2 times the amount of back pay with interest," and "compensation for litigation costs, expert witness fees, and reasonable attorneys' fees." 15 U.S. Code § 78u–6(h)(c). As stated above, Kuba has conceded that reinstatement, or front pay in lieu of reinstatement, is for the Court to decide. As with the SOX claim, all other potential relief under the DFA is equitable and for the Court to decide. *See Pruett v. BlueLinx Holdings, Inc.*, 2013 WL at 6335887 at *2-3.

In addition, the DFA does not provide for any non-economic damages, such as damages for emotional distress. *See Frye v. Anadarko Petroleum Corp.*, 953 F.3d at 290 ("Further, the district court held that the Dodd-Frank Act does not allow for recovery of noneconomic damages.").

Finally, while the DFA provides for double back pay, any award of double back pay is not in addition to an award of back pay under another cause of action. There is no pyramiding of back pay. Rather, a prevailing DFA plaintiff is only

entitled to the amount of back pay proven to be owed, multiplied by two.[15] This is clear on the face of the statute. *See Wadler v. Bio-Rad Laboratories, Inc.*, 916 F.3d 1176, 1184 (9th Cir. 2019) ("The jury returned a verdict in favor of Wadler on all three claims. As to all three claims in general, *the jury awarded Wadler $2.96 million in compensatory damages for past economic loss* against both Defendants. *The district court doubled that amount under Dodd-Frank's doubling provision*, 15 U.S.C. § 78u-6(h)(1)(C)(ii), *resulting in a total award of $5.92 million* plus interest... we vacate with instructions to enter judgment in favor of Bio-Rad as to the Dodd-Frank claim...we therefore *also vacate the portion of damages attributable solely to the Dodd-Frank verdict, approximately $2.96 million* plus interest." [emphasis added]).  Thus, the DFA does not permit a plaintiff to "triple dip," *i.e.*, to be awarded back pay plus an additional award of double back pay.  *See also Pratt v. Premier Salons, Inc.*, 181 F. Supp. 3d 158, 159 (D.P.R. 2015) (rejecting trebling of damages under a double damages provision, and noting the "plaintiff is entitled to only one full recovery, no matter how many legal grounds may support the verdict.")

### D.    FWA

For a prevailing plaintiff on a FWA claim, the law provides the following potential remedies: reinstatement to the prior position occupied or an equivalent position, including reinstatement to full fringe benefits and seniority, compensation for lost wages, benefits and other remuneration, and any other compensatory

---

[15] Based on the Joint Pretrial Statement, it appears Kuba will contend that she effectively is entitled to treble back pay based on her assertion that she is entitled to back pay under "all counts", as well as double back pay under her DFA count. On the face of the DFA, this is not allowed.

damages allowable by law. *See* Fla. Stat. § 448.102. Under the FWA, the jury decides all damages, except the equitable remedy of reinstatement, or front pay in lieu of reinstatement, which the parties agree is for the Court to decide.

**E.   EVEN IF KUBA PREVIALS ON SOME CLAIM, NEITHER REINSTATEMENT NOR FRONT PAY IS APPROPRIATE IN THIS CASE**

It is well established law that reinstatement is not appropriate and is disfavored where "discord and antagonism between the parties would render reinstatement ineffective." *See, e.g., U.S. E.E.O.C. v. W&O, Inc.*, 213 F.3d 600, 619 (11th Cir. 2000); *See also Reiner v. Fam. Ford, Inc.*, 146 F. Supp. 2d 1279, 1285-1286 (M.D. Fla. 2001) (citing *W&O, Inc.*); *Servillo v. Sola Medi Spa, LLC*, 2021 WL 406177 (M.D. Fla., 2021); *Aery v. Wallace Lincoln-Mercury, LLC*, 118 So. 3d 904, 915 (Fla. 4th DCA , July 31, 2013) (stating "'reinstatement is not viable because of continuing hostility between the plaintiff and the employer or its workers'" in the context of the FWA) (citation omitted). Here, as reflected in the Court's summary judgment Order, the indisputable evidence establishes that there was much discord and antagonism between Kuba and numerous employees of DFS, as demonstrated by the near daily accusations of mistreatment and wrongdoing she made against them. Many of those employees (e.g., Kalso, Martin, members of A&A such as Amanda Schweigart, and Quandra Love) are still employed by DFS. Moreover, the protracted litigation over several years in this case will have further heightened Kuba's antagonism toward both DFS generally and these (and other) employees specifically. Kuba's

reinstatement is also improper on the basis of the after-acquired evidence of her misconduct, which is discussed above. *Crapp,* 242 F.3d at 1021. Thus, reinstatement is not an appropriate remedy in this case.

There are three reasons why an award of front pay in lieu of reinstatement likewise is not appropriate in this case. First, as discussed above, it is barred by DFS's after-acquired evidence defense. *Id.* Second, since Kuba already has been gone over five years, any such award would be speculative. *See, e.g., Otis Elevator Co. v. Scott*, 551 So. 2d 489 (Fla. 4th DCA 1989), *approved,* 572 So. 2d 902 (Fla. 1990) (stating employee failed to establish with reasonable certainty that loss of future earnings was a result of termination under worker's compensation retaliation statute); *Chaudhry,* 305 So. 3d at 817 (stating reasonable certainty is required to recover loss of future earnings under FWA); *Posada v. James Cello, Inc.*, 2008 WL 11412200 (S.D. Fla. May 21, 2008).  Third, an award of front pay is inconsistent with a plaintiff's duty to mitigate damages. *See, e.g., Richardson v. Tricom Pictures & Productions, Inc.*, 334 F. Supp. 2d 1303, 1318 (S.D. Fla. 2004), *aff'd,* 183 F. App'x 872 (11th Cir. 2006) (stating that award of front pay would not be appropriate given plaintiff's failure to mitigate her damages); *Hudson v. Chertoff*, 473 F. Supp. 2d 1292, 1297-1302 (S.D. Fla. 2007) (vacating jury's award of front pay where plaintiff failed to mitigate damages). Moreover, when an "'employer proves that the employee has not made reasonable efforts to obtain work, the employer does not also have to establish the availability of substantially comparable employment.'" *Hudson* at 1297

(citing and quoting *Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515 (11th Cir. 1991) (abrogated on other grounds)). Another factor that courts look at when determining the propriety of front pay is whether the plaintiff has proven that they are unable to secure future equivalent employment. *Richardson,* 334 F. Supp. 2d at 1319 ("Because Richardson did not prove that her injuries precluded her from obtaining subsequent employment, she is not entitled to front pay."). Here, the evidence at trial will establish that after five years, especially with the demand in the labor market, Kuba has failed to reasonably mitigate her damages, and furthermore, Kuba will be unable to satisfy her burden of proving that she could not find employment comparable to her employment at DFS soon if she wanted it.

## CONCLUSION

As this Brief discussed and the evidence will confirm, Kuba's claims lack any merit and she cannot prevail at trial.

Dated this  6th  day of September, 2022.

/s/ *Mary Ruth Houston*
MARY RUTH HOUSTON, ESQ.
Florida Bar No. 834440
Email address:  mhouston@shutts.com
REED SEBASTIAN ARROYO, ESQ.
Florida Bar No. 1013893
Email address:  sarroyo@shutts.com
**SHUTTS & BOWEN LLP**
300 S. Orange Avenue, Suite 1600
Orlando, Florida 32801-5403
Telephone:  (407) 423-3200
Facsimile:   (407) 425-8316

and

STEPHEN L. BERRY, ESQ.
(Admitted Pro Hac Vice)
Email:*stephenberry@paulhasting.com*
PAUL HASTINGS LLP
695 Town Center Drive
Seventeenth Floor
Costa Mesa, CA  92626
Telephone:   (714) 668-6200
Facsimile:    (714) 979-1921
*Attorneys for Defendant*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 6<u>th</u> day of September, 2022, a true and correct copy of the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system, which will automatically send notification of such filing to the following:  Frank M. Malatesta, Esq. of MALATESTA LAW OFFICE, frank@malatestalawoffice.com; staff@malatestalawoffice.com, counsel for Plaintiff.

*/s/  Mary Ruth Houston*
Counsel of Record

ORLDOCS 19906270 9